IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST EASTON TWO, LP, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 19-801 |
| | : | |
| v. | : | |
| | : | |
| BOROUGH COUNCIL OF WEST | : | |
| EASTON and BOROUGH OF WEST | : | |
| EASTON, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                    September 25, 2020

The plaintiff, a corporate entity seeking a permit to operate a residential treatment center, drafted a proposed ordinance to permit this use for consideration by the defendant. The defendant, a Borough and corresponding Borough Council, enacted the proposed ordinance. The plaintiff now sues, claiming the defendants violated (1) the Fourteenth Amendment Due Process and Equal Protection Clauses; (2) the Rehabilitation Act; and (3) the Americans with Disabilities Act when they enacted an ordinance with specific criteria pertaining only to residential treatment centers and when they denied its three conditional use applications. The plaintiff claims the ordinance facially violates the statutes and the Constitution and the manner in which the defendants applied the ordinance to it constitutes an as-applied violation.

The defendants have moved to have the court enter summary judgment in their favor. The court concludes there are genuine issues of material fact that preclude granting summary judgment on these claims. Accordingly, the court denies the defendants' motion for summary judgment.

## I.   PROCEDURAL HISTORY

The plaintiff, West Easton Two, LP, commenced this action by filing a complaint against the Borough Council of West Easton and the Borough of West Easton on February 25, 2019. Doc. No. 1. In the complaint, the plaintiff alleges that it planned to "operate a comprehensive, medically supervised and licensed inpatient substance abuse treatment services facility" in the borough. Compl. at ¶ 7. The plaintiff intends to use methadone to treat some of its patients at this facility. *Id.* at ¶ 8.

The plaintiff's facility would be located in a light industrial ("L-I") zoning district in the borough. *Id.* at ¶ 12. Residential treatment centers and offices are included as permitted uses in the L-I zoning district. *Id.* at ¶ 13. The proposed facility would be located at a property that includes a Northampton County DUI Center. *Id.* at ¶ 11.

The defendants adopted an ordinance, Ordinance No. 966, on September 23, 2013. *Id.* at ¶ 14. This ordinance stated that, *inter alia*, (1) the residential treatment center cannot distribute methadone to patients on an outpatient basis, (2) a third party must drop off and pick up any patients entering or leaving the center, and (3) any patient residing at the center must pay a $150 temporary resident fee. *Id.* at ¶ 16.

The plaintiff submitted a conditional use application on November 29, 2017, for which the defendants held three hearings. *Id.* at ¶¶ 20–21. The plaintiff alleges that members of the Borough Council of West Easton made statements evidencing their discrimination against individuals needing drug and alcohol treatment during the hearings. *Id.* at ¶¶ 22–23. Ultimately, the defendants denied the conditional use application. *Id.* at ¶ 24. The plaintiff contends that this denial was discriminatory. *Id.* at ¶ 25.

Based on these allegations, the plaintiff brings an action under 42 U.S.C. § 1983 in count I of the complaint claiming that the defendants violated the Fourteenth Amendment Due Process and Equal Protection Clauses because both the "Ordinance and denial of the Conditional Use application and attempt to prevent Plaintiff Treatment Center from opening is arbitrary, based on irrational prejudices against, and perceptions of methadone patients and patients suffering from drug and alcohol addiction and is not rationally related to any legitimate government interests." *Id.* at ¶ 30. In count II, the plaintiff alleges that the defendants violated the Rehabilitation Act, 29 U.S.C. § 794, because "Defendant Borough's attempts to prevent the Treatment Center from opening and failure to grant the Treatment Center's Conditional Use application is a covered activity within the meaning of the Rehabilitation Act." *Id.* at ¶ 38. In count III, the plaintiff alleges that the defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), because of their "discriminatory actions including the adoption of different standards for 'treatment centers' than for other medical clinics and businesses, the application of these standards to the Treatment Center, and the failure to grant Plaintiff Treatment Center's Conditional Use application." *Id.* at ¶ 45. The plaintiff seeks for relief: (1) a declaration that the defendants' "Ordinance, actions and inaction in failing to permit [it] to occupy the Medical Office violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;" (2) a permanent injunction enjoining Defendants from continuing to violate the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;" (3) "an injunction requiring Defendants, within five (5) days of Court Order, to issue [it] a permit for occupancy for a medical drug and alcohol treatment center at the Medical Office;" (4) damages; and (5) attorney's fees and costs. *Id.* at 7–8.

The defendants filed an answer to the complaint on March 21, 2019. Doc. No. 6. After the parties completed with discovery, the defendants filed a motion for summary judgment on November 20, 2019. Doc. No. 14. The defendants appended exhibits in support of the motion for summary judgment on November 26, 2019. Doc. No. 16. The plaintiff filed a brief in opposition to the motion for summary judgment along with a number of exhibits on December 16, 2019, December 17, 2019, and December 18, 2019. Doc. Nos. 17–28. The defendants filed a reply brief in further support of the motion for summary judgment on December 23, 2019. Doc. No. 30.

The court held oral argument on the motion for summary judgment and a settlement conference with counsel for the parties and the parties' representatives on January 30, 2020. Doc. Nos. 31, 32, 39. On that same date, and with permission of the court, the plaintiff filed a response to the defendants' statement of uncontested facts. Doc No. 38.

During the pendency of this litigation, the parties made the court aware that there was a pending state court appeal from the defendants' decision relating to the plaintiff's conditional use application. The court held a telephone conference with counsel for the parties on June 22, 2020 to discuss the status of this related state court appeal. Doc. No. 42. After the telephone conference, the court ordered that the parties supplement the record to indicate how the most recent state court decision impacted the ongoing federal case and the pending motion for summary judgment. Doc. No. 44. The defendants filed a brief in response to the court's request on July 8, 2020, arguing that the plaintiff no longer had standing in this court because of the state court's order. Doc. No. 45. The plaintiff filed a brief in reply to the defendants' argument on August 21, 2020. Doc. No. 46. The court held oral argument on the additional briefing on August 25, 2020. Doc. No. 47.

The defendants' motion for summary judgment is now ripe for resolution.

## II.    FACTUAL BACKGROUND

The uncontested material facts are as follows. The Borough of West Easton ("Borough") is a small borough of approximately 0.3 square miles with a population of less than 1,500 people. Defs.' Concise Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' Facts") at ¶ 3, Doc. No. 14-1; Pl.'s Resp. to Defs.' Statement of Uncontested Facts ("Pl.'s Resp.") at ¶ 3, Doc. No. 38. The Borough Council of West Easton ("Borough Council") is the governing body of the Borough. Defs.' Facts at ¶ 4; Pl.'s Resp. at ¶ 4.

The plaintiff owns property in the Borough's Light Industrial Zoning District. Defs.' Facts at ¶¶ 5–6; Pl.'s Resp. at ¶¶ 5–6. The property is located in the Reda Complex, an eight-acre parcel that houses several different buildings. Defs.' Facts, Ex. A, Dep. of Abraham Atiyeh ("Atiyeh Dep."), at 8:2–22, Doc. No. 16-1. Abraham Atiyeh owns the entire complex, and there are approximately four to eight buildings within the Complex. *See id.* (stating that there are eight buildings in complex); Defs.' Facts, Ex. B, Dep. of Mickey K. Thompson, Esq. ("Thompson Dep."), at 17:12–22, Doc. No. 16-2 (stating that there are four buildings included in complex). Northampton County operates a DUI Center in Building A, and Buildings B and C are vacant. Atiyeh Dep. at 8; Defs.' Facts, Ex. M, Pl.'s Nov. 29, 2017 Conditional Use Application ("Nov. 2017 Appl.") at ECF p. 1, Doc. No. 16-4; Defs.' Facts, Ex. Q, Borough Council's Decision on Pl.'s Conditional Use Application ("Decision") at ECF p. 78, Doc. No. 16–5.[1] However, Mr. Atiyeh sought to put a 176-bed rehabilitation treatment center in Building B. Nov. 2017 Appl. at ECF p. 2; Decision at ECF p. 78.

The plaintiff, by and through its employee, Mickey K. Thompson, Esq., drafted ordinances to accommodate its development plans for Building B. Defs.' Facts at ¶ 11; Pl.'s Resp. at ¶ 11.

---

[1] The court references the electronic filing pages at various parts of this opinion for ease of reference as the exhibits are grouped together on multiple occasions.

Attorney Thompson presented these ordinances to the Borough Council for passage. Defs.' Facts at ¶ 11; Pl.'s Resp. at ¶ 11. Attorney Thompson testified that he agreed to include certain provisions in the ordinances because the Borough Council would not have passed the ordinances otherwise. *See* Thompson Dep. at 29:16–20 ("Well, I think it was pretty much couched to us that we would not be able to get any development approved or passed unless there was some way for the borough to make up for whatever issues were going to be occurring because of the proposed uses."); *id.* at 52:24–53:3 ("I knew or they told us that they would not allow methadone -- they didn't want a methadone clinic in West Easton. So, basically, I knew if we were to try to include that then they wouldn't adopt the legislation.").

One of these ordinances, Ordinance 885, applied to the DUI Center in Building A. Defs.' Facts, Ex. K, Ordinance 885 ("Ordinance 885") at ECF pp. 199–203, Doc. No. 16-3. The Borough Council enacted Ordinance 885 in 2010. *Id.* Ordinance 885 defines the "Residential DUI Treatment Facility" as

> [a] residential facility that provides housing, supervision and counseling for persons approved in writing to reside in such a facility by the Government and/or Court System, and who reside in such a facility because [of] an arrest for driving under the influence (DUI) for persons needing treatment because of addiction to alcohol.

*Id.* at ECF p. 201. The ordinance explains that

> the residents of the Residential DUI Treatment Facility are repeat offenders in terms of driving under the influence who have applied for and received approval from the Judiciary of the Commonwealth of Pennsylvania to reside in the proposed DUI Treatment Facility and view this program as an opportunity to avoid prison time at the County or State level[.]

*Id.* at ECF p. 200. It also compels residents at the DUI Center to pay a $150 temporary residence fee. *Id.* at ECF p. 201.

Ordinance 966 is the ordinance at the crux of this case. The Borough Council passed Ordinance 966 on September 23, 2013, when then-Mayor Gerald Gross signed it. Defs.' Facts at

¶ 17; Pl.'s Resp. at ¶ 17; Defs.' Facts, Ex. L, Ordinance 966 ("Ordinance 966) at ECF pp. 206–08, Doc. No. 16-3.

Ordinance 966 amended section 701 of the Borough's Zoning Ordinance. Pl.'s Ex. 9, Borough of West Easton Zoning Ordinance ("Zoning Ordinance") at 45, Doc. No. 21; Defs.' Facts at ¶ 17; Pl.'s Resp. at ¶ 17. Section 701 of the Zoning Ordinance regulates the Borough's Light Industrial District. Zoning Ordinance at 45. Section 701 provides that certain buildings or other structures are "uses-by-right:"

> A building or other structure may be erected, altered, or used, and a lot may be used or occupied for any of the following purposes, and no other:
>
> a.    Assembly of office equipment and electrical appliances and supplies; and similar processes not to include the manufacturing of iron, steel, other metals or alloys, or metal processing.
>
> b.    Manufacturing of light industrial products from already prepared materials (such as cloth, leather, plastic, paper, glass); manufacturing of professional, scientific, or electrical improvements; jewelry; watches and similar products.
>
> c.    Research, engineering[, ]or testing laboratories.
>
> d.    Public utility operating facilities.
>
> e.    Printing or publishing establishments.
>
> f.    Office building.
>
> g.    Wholesale warehouse, and distribution.

*Id.* at 45–46.

Section 701 provides for several "special exception uses" that allow "[a] building or other structure [to be] erected, altered or used for any one of the following uses when authorized as a special exception by the Zoning Hearing Board." *Id.* at 46. These include "[m]otor vehicle body

or fender repair;" "[a]utomobile service station;" and "[u]ses similar to those permitted by special exception." *Id.*

Additionally, Ordinance 966 amends section 701 to permit additional uses "by conditional use within the LI—Light Industrial Zoning District in the Borough of West Easton Zoning Ordinance." Ordinance 966 at ECF p. 206 (capitalization and emphasis omitted). The Borough's Zoning Code defines a conditional use as

> [a] use which may not be generally appropriate to a particular zoning district, but which may be suitable in certain locations within the district only when specific conditions prescribed for such use within this Ordinance are present. Conditional uses are granted or denied by the Borough Council after a hearing to determine whether or not such conditions are present.

Zoning Ordinance at 8. Ordinance 966 also amends section 701 to permit conditional uses

> for adaptive reuse of structures formerly used for light industrial purposes to include Assisted Living Facilities, Residential Treatment Centers, Residential DUI Treatment Centers, and multi-family dwellings (apartments) to provide housing for older persons and other persons needing assistance, the infirmed, affordable unsubsidized housing, and to provide facilities to decrease recidivism.

Ordinance 966 at ECF p. 206. This ordinance defines a residential treatment center as a "facility whose primary function is to temporarily house individuals for the purpose of receiving medical, psychological, or social treatment and/or counseling." *Id.*

Ordinance 966 provides 14 requirements which apply exclusively to "residential treatment center[s]." *Id.* The plaintiff clarified during oral argument on August 25, 2020, that three of those provisions are at issue in this case. First, the requirement that "[t]he Residential Treatment Health Center shall not distribute methadone to residents as a modality for treatment for clients on an out-patient basis;" second, the requirement that "[a]ny private resident residing in the Residential Treatment Center shall be required to pay a temporary residency fee to the Borough of $150;" and third, the requirement that "[a]ny residents entering or leaving the Residential Treatment Center

must be picked up and dropped off by a third party through a secured process to prevent entry to and discharge into the public."[2] *Id.* at ECF p. 207.

On November 29, 2017, Mickey Thompson, on behalf of the plaintiff, filed the first of three conditional use applications with the Borough, seeking to develop a residential treatment facility in Building B of the Reda Complex. Defs.' Facts at ¶ 20; Pl.'s Resp. at ¶ 20. The Borough Council held hearings on the first conditional use application on January 8, 2018 and February 12, 2018. Defs.' Facts at ¶¶ 21–22; Pl.'s Resp. at ¶¶ 21–22.

During the hearings, members of the Borough Council and residents of the Borough made several notable remarks. Then-Mayor Gerald Gross said "there's no damn reason why a druggie gets better treatment than a D. U. I. [sic] person in the jail over there. As far as I'm concerned, they're no different, and they're treated so loosely, it's unbelievable." Defs.' Facts, Ex. N, Feb. 12, 2018 Cont'd Continual Use Appl. Hr'g ("Feb. 12, 2018 Hr'g") at ECF p. 164, Doc. No. 16-4. The former mayor indicated there should be "a hundred or 200 foot restriction" on placing the clinic in a residential area. *Id.* at ECF p. 165. Council Member Nodoline expressed multiple concerns. He worried about the fact that West Easton does not have a police department yet, because a "riot" could break out in this "drug rehab" and there would not be anyone to call. *Id.* at ECF pp. 95–96. He also worried about building "this thing in our town" because he wondered "[h]ow much is the property value going to hurt our taxpayers?" *Id.* at ECF p. 98.

Residents of the Borough also expressed concerns. One woman explained that an "inmate" from the adjacent DUI center broke into "one of the apartments," so she had "a concern that [the residential treatment center clients] could walk out of this facility" and "right into [her] house." *Id.*

---

[2] The plaintiff explained during oral argument that it will need to use outpatient methadone treatment even though it is a residential treatment center, because once the treatment center discharges a patient, the patient will still need some methadone access in order to abide by proper treatment protocols.

at ECF p. 135. Another woman called the residents at the proposed facility "criminals" and worried that "all criminals have the right to walk out of your center [at] any time." *Id.* at ECF p. 154. She worried that this meant "criminals are going to walk our streets. If that's their choice -- we have a jail. If they did something, they would be there." *Id.* at ECF p. 155. Another resident expressed concern that people "battling drugs or depression" might "decide to do something stupid while [his] kids are in the yard." *Id.* at ECF p. 136. He concluded by asserting that the Council members, much like him "wouldn't want [the facility] in [their] neighborhood." *Id.* He proceeded to ask a witness if he "would want this across the street from -- from where [he] live[s]." *Id.* at ECF p. 138. The community member guessed the witness would not, given that the facility would house "176 people that have issues." *Id.* at ECF p. 139. Ultimately, Council Vice President Dees agreed that he "wouldn't want to be across the street from [the facility] either." *Id.* at ECF p. 140. Another resident wondered "[w]hat's the nurse going to do when there's three druggies fighting? What's the nurse going to do? Who's she going to call? I call 9-1-1. I get the state police. You know what their reaction is? We can't handle that." *Id.* at ECF p. 153. He expressed that those at the facility "all ain't good people. They're in there for other things that they've done, but if they stay, it's rehab, but they've done other things." *Id.*

The Borough Council denied the first conditional use application via a written decision on March 20, 2018. Defs.' Facts at ¶ 23; Pl.'s Resp. at ¶ 23. Following this denial, the plaintiff submitted a second conditional use application to operate a drug and alcohol treatment center on March 22, 2018. Defs.' Facts, Ex. S at ECF pp. 111–42, Doc. No. 16-5. The Borough Council held a hearing on the second conditional use application on May 14, 2018. Pl.'s Ex. 12, 2d Conditional Use Appl. Hr'g, Doc. No. 24. During the second conditional use hearing, Council members again expressed notable concerns. For example, Council Member Mammana claimed "I'm concerned

about [clinic clients] getting out, walking the streets. We've got young children going to school, young children playing in the yards. I'm not happy with that part." *Id.* at ECF p. 64. On June 27, 2018, the Borough Council denied the plaintiff's second application for conditional use to run the treatment center. Defs.' Facts, Ex. T at ECF pp. 143–76, Doc. No. 16-5.

The plaintiff appealed the denial of the March 22, 2018 conditional use application to the Court of Common Pleas of Northampton County. Defs.' Facts, Ex. J, Op., *West Easton Two, LP v. Borough Council of West Easton, et al.*, No. C-48-CV-2018-6772 (Northampton Cnty. Ct. Com. Pl.) ("Opinion") at ECF pp. 175, 176, Doc. No. 16-3. On April 12, 2019, the Honorable Jennifer R. Sletvold entered the opinion of the court. *Id.* at ECF pp. 175–98. Judge Sletvold specifically took "no position . . . on whether" Ordinance 966 "is discriminatory as this question [was] not presently before [her]. [The court] note[d] that a lawsuit is currently pending in federal court on the constitutionality of the decision of Borough Council and the Ordinance." *Id.* at ECF p. 187 n.9. Judge Sletvold partially affirmed and partially reversed the Borough Council's decision to deny the second conditional use application. *Id.* at ECF p. 198.

The plaintiff submitted a third conditional use application on May 17, 2019. Pl.'s Ex. 6, May 17, 2019 Conditional Use Application ("May 2019 Appl."), Doc. No. 18. Members of the Borough Council acknowledged during depositions that the third conditional use application conformed to Judge Sletvold's April 12, 2019 opinion. Defs.' Facts, Ex. E, Videotaped Dep. of Matthew Dees ("Dees Dep.") at 68:18–25–69:2–6, Doc. No. 16-3; Defs.' Facts, Ex. F, Videotaped Dep. of Jeffrey Breidinger ("Breidinger Dep.") at 56:1–25, Doc. No. 16-3.[3] Nonetheless, the defendants denied the third conditional use application. One Council member testified the Board

---

[3] These references are located on ECF pp. 18, at 45, respectively.

denied the application because "the facility was not locked," out of "an uneducated fear" of "treatment facilities," and "fear of who would run" this treatment facility. Dees Dep. at 69:7–14.[4]

The plaintiff appealed the denial of the third conditional use application to the Northampton County Court of Common Pleas. Defs.' Reply Br. on the Effect of the Resolution of the State Ct. Litigation on the Instant Litigation ("Defs.' Suppl. Br."), Ex. A at ECF p. 15, Doc. No. 45. On February 12, 2020, Judge Sletvold issued an order reversing the Borough Council's decision based on an agreement between the parties. *Id.*

Between the third conditional use application and Judge Sletvold's February 12, 2020 order, Council Vice President Matthew Dees wrote to his fellow Council members to express that "no better example of [Not in My Back Yard mentality] can be found[] than that which [he] heard from the public who spoke at the three Conditional Use Hearings" because "[t]he public made statements of drug addicts escaping and breaking into homes, them wandering the streets looking for drugs, children's safety, riots, mass exodus, and a host of other *unreasonable* fears and prejudices." Pl.'s Ex. 7 at 1, Doc. No. 19 (emphasis in original). Vice President Dees also expressed concern that there was "too much comparison and reference by residents[] to the Work Release Facility now in operation." *Id.* He acknowledged that "Council cannot be influenced in their decision[] by problems with the operation of a different facility." *Id.* He clarified that he is "no fan of Mr. Atiyeh" and "ha[s] no belief that he desires the facility simply because of his concern about the drug epidemic." *Id.*

---

[4] This reference is located at ECF p. 18.

## III.    DISCUSSION

### A.    <u>Standard of Review – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, it is up to the non-moving party to counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence. . . of a genuine dispute"). The non-movant must show more than the "mere scintilla

13

of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. "[B]are assertions, conclusory allegations, or suspicions" are insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation and internal quotation marks omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe

[them]," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.   Analysis

The court's analysis consists of two broad components. First, the court evaluates the way in which the state court's recent February 12, 2020 order impacts this case. Second, after concluding that the February 12, 2020 order does not preclude the plaintiff's claims from moving forward, the court examines the merits of the summary judgment motion. The court first examines the merits of the facial and as-applied statutory claims that the plaintiff brings under the ADA and Rehabilitation Act. Next, the court examines the merits of the Equal Protection Clause claim. Finally, the court examines the merits of the substantive due process claim.

### 1.   The Impact of the State Court's February 12, 2020 Order

At the court's request, the parties filed additional briefing concerning the ways in which the state court's February 12, 2020 order impacts this litigation. The defendants' argument focused on standing.[5] *See* Defs.' Suppl. Br. at 4–11. They argue that the court should dismiss this case without reaching the merits because of Judge Sletvold's February 12, 2020 order reversing the Borough Council's decision to deny the plaintiff's third conditional use application. The defendants contend that the plaintiff presents no case or controversy for this court to decide, it is no longer aggrieved and lacks standing, and it has no justiciable harm. *Id.* at 4, 6, 8. In response to the defendants' arguments, the plaintiff asserts that a case or controversy remains because "the constitutional and statutory claims regarding Ordinance 966 remain to be decided and present a real and substantial controversy;" "the claims touch on the parties' adverse legal interests given

---

[5] The defendants are free to raise a standing argument even at the motion to dismiss stage. *See* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3531.15 (3d ed. 2008) (Standing can be "presented by motion on the pleadings, by a preliminary fact hearing, by summary judgment, or by trial").

that the provisions of Ordinance 966 . . . injure Plaintiff and prevent Plaintiff from successfully opening a residential treatment facility;" and "the relief sought is of a specific conclusive character including damages and striking portions of the temporary resident fee and the methadone prohibition in Ordinance 966." Pl.'s Br. in Further Opp'n to Defs.' Mot. for Summ. J. Regarding the Limited Impact of the Decision of the Northampton Cnty. Ct. of Com. Pl. on Pl.'s Case ("Pl.'s Suppl. Br.") at 6, Doc. No. 46. The court finds that the state court's February 12, 2020 order does not affect the plaintiff's standing to assert its claims.

Under Article III of the Constitution, federal courts are "courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), that can only make decisions about actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 2. A plaintiff can only litigate in federal court if the plaintiff has standing to sue, meaning that the plaintiff presents an actual "Case" or "Controversy." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). The Supreme Court has enumerated three elements that comprise the "'irreducible constitutional minimum' of standing[.]" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1991)). Those three elements are: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citations omitted).

The argument in this case centers primarily around whether the plaintiff presents an injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted).

In evaluating the plaintiff's alleged injuries, the court bears in mind that "[t]he contours of the injury-in-fact requirement . . . are very generous, requiring only that claimant allege[] some specific, identifiable trifle of injury." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (alteration in original) (citation and internal quotation marks omitted). A harm is "'concrete'" if it "'actually exist[s]'" and is not merely "'abstract.'" *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (quoting *Spokeo*, 136 S. Ct. at 1540).

Other courts have specifically examined whether a plaintiff has standing when a statute or zoning regulation prevents the plaintiff from establishing a drug treatment center. In *Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399 (3d Cir. 2005), the Third Circuit concluded that the operator of a methadone clinic had standing to assert an action against the township for equitable relief and damages, alleging that a zoning ordinance prohibiting methadone clinics within 500 feet of certain facilities violated the ADA, the Rehabilitation Act, due process rights, and equal protection. *Id.* at 405–08. The parties did not "dispute that the broad language of the ADA and R[ehabilitation Act] evidences a Congressional intent to confer standing on entities like [the plaintiff] to bring discrimination claims based on their association with disabled individuals." *Id.* at 405. Rather, the defendant argued that the plaintiff's standing was "limited to claims for equitable relief and does not extend so far as to give [the plaintiff] the right to seek compensatory damages for its lost profits." *Id.* at 406. However, the Third Circuit found that because the plaintiff "assert[ed] that the corporation itself suffered injuries . . . because it cares for and/or associates with individuals who have disabilities, Plaintiff ha[d] standing to bring this suit on its own behalf." *Id.* at 407 (citation and internal quotation marks omitted).

In contrast, in *Aaron Private Clinic Management LLC v. Berry ("Aaron")*, 912 F.3d 1330, 1339 (11th Cir. 2019), the Eleventh Circuit found the plaintiff failed to establish Article III

standing because of its speculative claimed injuries of lost profits and because the plaintiff's claims were distinct from cases where "other federal courts have held that plaintiffs whose attempts to establish methadone clinics were thwarted by local regulations had standing to challenge those regulations[.]" *Id.* at 1336–37, 1339.

Regarding lost profits, the plaintiff alleged that it "aspired to open a methadone clinic someday, [but] it offer[ed] no facts suggesting that 'someday' was imminent or that [it] had any concrete plan for bringing its clinic into operation." *Id.* at 1337. Instead, the plaintiff only alleged it "form[ed] a limited liability company that will serve as a management company for future methadone clinics, and it vaguely allege[d] 'interference and delays . . . related to opening a business.'" *Id.* As for the difference between the plaintiff's claims and those in which "other federal courts have held that plaintiffs whose attempts to establish methadone clinics were thwarted by local regulations had standing to challenge those regulations," the court distinguished the claims because "those other decisions involved plaintiffs who had taken far more concrete steps than [the plaintiff] ha[d] allegedly taken" to establish the clinics at issue. *Id.* at 1339 (citations omitted). For instance, in *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 358–62 (4th Cir. 2008), the plaintiff "unquestionably" had standing because it "located a particular clinic location and signed a lease," "consulted with local officials about founding its clinic," "applied for the required federal and state certifications and permits," [and] "submitted detailed plans about the requested clinic site to county officials[.]" *Id.* (citing *A Helping Hand*, 515 F.3d at 358–62).

The court applies these decisions to the case at hand. During oral argument on August 25, 2020, the plaintiff indicated that it brings these claims on behalf of the clinic's clients who would have to pay a $150 fee for coming to the facility and on behalf of itself for constitutional and economic harms suffered. Those economic harms stem from losing the opportunity to contract

with a potential tenant that expressed interest in running the rehabilitation treatment center on the plaintiff's property. Thompson Dep. at 60:11–15.

This court finds that the plaintiff has standing to bring claims on behalf of its clients and on its own behalf. "[T]he broad language of the ADA and R[ehabilitation Act] enforcement provisions evidences a Congressional intent to extend standing to the full limits of Article III," such that the plaintiff establishes standing on behalf of its clients. *Addiction Specialists*, 411 F.3d at 405. The plaintiff also has standing to bring its own constitutional claims under section 1983 if the defendants allegedly discriminated against it based on its association with individuals who are disabled. *Id.* at 407 n.6 ("[A] corporation has standing to bring constitutional claims on its own behalf.").

Regarding its own economic claims, the plaintiff establishes standing because "the ADA grants the right to relief to any person alleging discrimination on the basis of disability . . . and the R[ehabilitation Act] extends remedies to any person aggrieved by unlawful discrimination." *Id.* at 405 (internal quotation marks and citations omitted). The plaintiff "alleges discrimination based on the entity's association with its clientele" in a manner that is sufficient to establish an injury. *Id.* at 406. The plaintiff's alleged injury is distinct from the supposed injury alleged in *Aaron* and more akin to the injury alleged in *A Helping Hand*. Here, unlike in *Aaron*, the plaintiff "ha[s] taken far more concrete steps" to establish the clinic. 912 F.3d at 1339. Like the plaintiff in *A Helping Hand*, the plaintiff has selected a location and signed a lease, consulted with officials about the clinic, submitted plans to officials concerning the clinic, and had a prospective clinic operator ready to begin clinic operations. *See* Defs.' Facts at ¶ 5 ("Plaintiff is the owner of a real property located [at] 92 Main Street in the Borough of West Easton, which is part of a campus of other parcels also owned by Plaintiff."); Pl.'s Resp. at ¶ 5; Thompson Dep. at 26:15–17, 60:11–13

(referencing "one of several plans that [the plaintiff] presented to the Borough of West Easton" and the "potential tenant"). In determining that the plaintiff establishes standing for its economic injury, "we do not reach the issue of whether [the plaintiff's] lost profits would be the correct measure of damages if and when this suit reaches the damages stage. We hold only that [the plaintiff] has standing to *seek* damages on its own behalf." *Addiction Specialists*, 411 F.3d at 408.

The defendants argue that these harms no longer exist because the plaintiff can move forward with building the residential treatment facility, given Judge Sletvold's February 12, 2020 order. Therefore, the defendants argue, the plaintiff is no longer aggrieved and fails to establish a justiciable harm. Defs.' Suppl. Br. at 6–9. However, Judge Sletvold's opinion and order do not address the alleged constitutional and economic harms. In her prior decision on the appeal of the second conditional use application, Judge Sletvold explicitly refused to consider whether these requirements amounted to constitutional violations. *See* Opinion at 13 n.9. The February 12, 2020 opinion and order do not remedy the purported harm attributable to the defendants' initial decisions to deny the plaintiff's conditional use applications and does not amend Ordinance 966. Therefore, the state court's order does not impact the standing analysis.

The facts before the court are similar to *Sullivan v. City of Pittsburgh*, 811 F.2d 171 (3d Cir. 1987). *Sullivan* concerned the City of Pittsburgh's decision to amend its zoning code and deny use permits to alcoholic treatment centers. 811 F.2d at 172. The plaintiffs, recovering alcoholics, sought to enjoin the closures. *Id.* The parties entered into a consent decree in the state court, but did not litigate the merits of the constitutional and statutory claims. *Id.* The Third Circuit concluded that the plaintiffs were not "afforded the full and fair opportunity to litigate those claims" and, as such, the plaintiffs could raise those claims in federal court. *Id.* at 181.

Similarly, here, the plaintiff did not obtain a judgment on the statutory and constitutional claims. Instead, the state court sought to leave those claims in the hands of the federal court. The alleged injuries of these statutory and constitutional harms persist, because residents of the plaintiff's facility will still need to pay an allegedly improper $150 fee, the plaintiff still cannot provide outpatient methadone treatment, and the plaintiff lost a contract with a client who was interested in operating the treatment center. Therefore, the plaintiff has standing to bring these claims.

### 2.    Merits of the Summary Judgment Motion

The court turns to the merits of the case to examine whether the defendants establish that "there is no genuine issue as to any material fact and the[y are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The plaintiff argues that Ordinance 966 violates the Rehabilitation Act and ADA facially and as applied to it. Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Br.") at 13, Doc. No. 17. The plaintiff also argues that Ordinance 966 violates the 14th Amendment due process and equal protection guarantees because it is both facially unconstitutional and unconstitutional as applied to it. *Id.* This merits analysis first evaluates the statutory claims the plaintiff brings under the ADA and Rehabilitation Act. The court denies the defendants' motion for summary on the facial and as-applied ADA and Rehabilitation Act claims. Second, the analysis evaluates the constitutional claims the plaintiff brings under equal protection and substantive due process. The court denies the defendants' motion for summary judgment on these claims as well.

### a.    The ADA and Rehabilitation Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

U.S.C. § 12132. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 29 U.S.C. § 794(a). These statutes "constitute[] a

general prohibition against discrimination by public entities, regardless of activity." *New

Directions Treatment Servs. v. City of Reading ("New Directions")*, 490 F.3d 293, 301 (3d Cir.

2007).

The plaintiff claims that Ordinance 966 facially violates the ADA and the Rehabilitation

Act because it discriminates against those who struggle with addiction. *See* Pl.'s Br. at 15 ("Here,

Ordinance 966 is facially discriminatory because it singles out drug and alcohol treatment centers

for different zoning procedures."). The plaintiff claims that the defendants also applied Ordinance

966 in a discriminatory manner when they denied its conditional use applications. *Id.* at 14.

As for the elements to establish a violation of the ADA or Rehabilitation Act:

To establish a violation of Title II of the ADA, plaintiffs must show:

> 1. they are "qualified individuals with a disability";
>
> 2. they are being excluded from participation in or denied the benefits of
> some service, program, or activity by reason of their disability, or subjected
> to discrimination by reason of their disability; and
>
> 3. the entity which provides the service, program or activity is a public
> entity.

To establish a violation of the Rehabilitation Act, the plaintiffs must establish that:

> (1) they are "individuals with disabilities" within the meaning of the Act;
>
> (2) they are "otherwise qualified" to participate in the activity or program
> or to enjoy the services or benefits offered;

(3) they have been excluded from participation, denied benefits of, or subjected to discrimination under any program or activity solely by reason of their disabilities; and

(4) the entity denying plaintiffs' participation or enjoyment receives federal financial assistance.

*First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135, 149 (D. Conn. 2003) (internal citations omitted).

"Congress has directed that the two acts' judicial and agency standards be harmonized." *New Directions*, 490 F.3d at 302 (citations and internal quotation marks omitted). However, as discussed further herein, the required "causative link between discrimination and adverse action is significantly dissimilar" in the two statutes. *Id.* at 300 n.4 (citation and internal quotation marks omitted).

The court's analysis of the ADA and Rehabilitation Act claims proceeds in three parts. First, the court addresses whether the plaintiff represents "qualified individuals with a disability" under the ADA and "individuals with disabilities" who are "otherwise qualified to participate in the activity or program or to enjoy the services or benefits offered" under the Rehabilitation Act and whether the statutes apply to the defendants. The court finds that the statutes apply to the plaintiff and the defendants. Second, the court examines whether the defendants have demonstrated that they are entitled to a judgment that the ordinance does not facially discriminate. The court finds that the defendants are not entitled to summary judgment on the facial discrimination claim. Third, the court considers whether the ordinance is discriminatory as applied. The court finds that the defendants are not entitled to summary judgment on the as-applied claim.

### i.    The Statutes Apply

The parties do not dispute that recovering addicts and the plaintiff constitute "qualified" persons under the ADA and Rehabilitation Act. *See* Defs.' Br. in Supp. of Mot. for Summ. J.

("Defs.' Br.") at 49 n.28, Doc. No. 14-2 ("Defendants do not dispute that . . . Plaintiff has standing to bring claims"); *see also New Directions*, 490 F.3d at 308 & n.11 (explaining that "recovering heroin addicts are presumptively 'qualified' persons under the ADA and Rehabilitation Act" and "[w]e recognized in *Addiction Specialists, Inc. v. Township of Hampton* that methadone clinic providers may assert both direct standing based on their own injuries and associational standing based on injuries to the disabled individuals they serve" (citations omitted)). The parties also do not dispute that the defendants are qualifying public entities subject to the statutes. *See* 42 U.S.C. § 12131(1)(B) (defining "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government"); Defs.' Br. at 49 n.28 ("Defendants do not dispute that these statutes are applicable to Defendants[.]").

ii.      *Overview of the ADA and Rehabilitation Act Facial Discrimination Claims*

A plaintiff can bring a facial challenge and an as-applied challenge under the ADA and Rehabilitation Act. There are two steps in a facial challenge analysis. First, the court must consider whether the government action is facially discriminatory. Second, the court must consider whether the protected individuals were likely to pose a significant risk to residents of the community. Based on this analysis, the court denies the defendants' motion for summary judgment on the plaintiff's ADA and Rehabilitation Act facial discrimination claims.

"[F]acially discriminatory laws present per se violations of" the statutes. *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch ("Bay Area")*, 179 F.3d 725, 735 (9th Cir. 1999). "A facially discriminatory policy is one which on its face applies less favorably to a protected group." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007) (footnote and citations omitted). When a plaintiff "challenges facially discriminatory actions . . . his claim is one of disparate treatment." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995).

"Once a plaintiff makes out a prima facie case of facial discrimination, the defendant may attempt to demonstrate that the challenged law's less-favorable application to the protected class is nonetheless permitted under the federal acts because the discrimination is objectively legitimate." *Mont. Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 837 (D. Mont. 2012); *see New Directions*, 490 F.3d at 305 (concluding statute was facially discriminatory and subsequently applying significant risk test). The ADA and the Rehabilitation Act require the defendant to show that the class of people subject to the discriminatory policy "we[re] likely to pose a significant threat to the health or safety of the residents protected by the zoning ordinance." *Bay Area*, 179 F.3d at 736.

A full analysis of the plaintiff's facial discrimination claims under the ADA and Rehabilitation Act proceeds in two parts. First, the court examines whether the defendants establish that Ordinance 966 is not facially discriminatory such that they are entitled to summary judgment on the claim. Second, because the court concludes that the defendants do not establish they are entitled to summary judgment solely based on an analysis of whether the ordinance is facially discriminatory, the court examines whether the defendants demonstrate the plaintiff's clients present a substantial risk, such that the defendants are entitled to summary judgment on this facial discrimination claim nonetheless. The court concludes that the defendants do not demonstrate the plaintiff's clients present a substantial risk. Therefore, the court denies the defendants' motion for summary judgment on the ADA and Rehabilitation Act facial discrimination claims.

(a)     Facial Discrimination

The defendants fail to demonstrate that they are entitled to summary judgment on the question of whether Ordinance 966 is facially discriminatory.[6] The ordinance "singles out

---

[6] The court renders no decision as to whether the ordinance is facially discriminatory and does not invalidate the ordinance because the plaintiff did not file a cross-motion for summary judgment and the defendants' motion for

methadone clinics" "for different zoning procedures" such that it is "facially discriminatory under the ADA and Rehabilitation Act." *New Directions*, 490 F.3d at 305.

Ordinance 966 includes a broad definition for a residential treatment center, *i.e.* a "facility whose primary function is to temporarily house individuals for the purpose of receiving medical, psychological, or social treatment and/or counseling." Ordinance 966 at ECF p. 206. Because this definition is so broad, there is no way for the court to conclude that *all* clients of these residential treatment centers would fall within the protections of the ADA and the Rehabilitation Act. For example, some individuals may require counseling or social treatment and not qualify as disabled under the ADA or Rehabilitation Act. In addition, Ordinance 966 also amended the possible conditional uses in the light industrial zoning district, and it is possible that individuals could qualify as "other persons needing assistance," who can receive housing through this ordinance, but are not disabled under the ADA and Rehabilitation Act. Therefore, the court does not find that all of the provisions are facially discriminatory in violation of the ADA and Rehabilitation Act.

Nonetheless, out of the 14 requirements in Ordinance 966 which are applicable to residential treatment centers, the sixth requirement "singles out methadone clinics" among all residential treatment centers in a manner that is facially discriminatory. *New Directions*, 490 F.3d at 305. The sixth requirement mandates that "The Residential Treatment Health Center shall not distribute methadone to residents as a modality for treatment or clients on an outpatient basis." Ordinance 966 at ECF p. 207.

---

summary judgment is not the proper vehicle in which to do so. *See, e.g.*, *New Directions*, 490 F.3d at 300 (explaining that district court had granted plaintiffs' motion for summary judgment); *Caron Found. of Fla., Inc. v. City of Delray Beach ("Caron")*, 879 F. Supp. 2d 1353, 1367 (S.D. Fla. 2012) (granting preliminary injunction preventing city from enforcing zoning ordinance reducing number of times proposed center could rent residences each year). Instead, the court only determines that the defendants' argument is insufficient to demonstrate the ordinance is not facially discriminatory at this stage.

The defendants argue that "[b]y its explicit terms, Ordinance 966 is plainly non-discriminatory" because it "was drafted by Plaintiff attendant with their interest in developing a portion of their property as a Residential Treatment Center" and because it "is permissive and not restrictive." Defs.' Br. at 51. In response, the plaintiff contends that the facts underlying the drafting of the ordinance and its permissive nature are not germane to the question of whether Ordinance 966 is facially discriminatory. Pl.'s Br. at 16. Rather, "Ordinance 966 is facially discriminatory because it singles out drug and alcohol treatment centers for different zoning procedures" by imposing "additional, discriminatory burdens on residents" such as "having to pay a $150 resident fee and not permitting methadone on an outpatient basis." *Id.* at 15.

The defendants' contention that a representative of the plaintiff helped draft Ordinance 966, which logically should have avoided any challenge to the ordinance, is irrelevant to the assessment of whether the ordinance is facially discriminatory. "When considering a facial challenge, intent is irrelevant." *Caron*, 879 F. Supp. 2d at 1367 (citations omitted); *see Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("The absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with discriminatory effect."); *see also Horizon House Dev. Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 694 (E.D. Pa. 1992) ("The motives of drafters of a facially discriminatory ordinance, whether benign or evil, [are] irrelevant to a determination of the lawfulness of the ordinance.").[7]

The defendants' argument that the ordinance is permissive also does not compel the court to decide Ordinance 966 is not facially discriminatory. To support the contention that permissive

---

[7] Notably, even the defendants agree with the plaintiff that an assessment of the drafters' underlying motives is irrelevant to a facial analysis. *See* Defs.' Br. at 51 ("The motives of drafters of a facially discriminatory ordinance, whether benign or evil is irrelevant to a determination of the lawfulness of the ordinance." (quoting *Horizon House Dev. Servs., Inc.*, 804 F. Supp. at 694)); *see also* Pl.'s Br. at 16 (same).

regulations cannot constitute facially discriminatory actions, the defendants contrast the facts of this case with those of *Arc of New Jersey, Inc. v. New Jersey* (*"Arc of New Jersey"*), 950 F. Supp. 637 (D.N.J. 1996). In *Arc of New Jersey*, the district court invalidated as facially discriminatory a provision of New Jersey's Municipal Land Use Law which authorized municipalities to treat as a conditional use any community residence or shelter housing seven or more persons and authorizing municipalities to deny a conditional use permit to any proposed residence or shelter with more than seven people that would be within 1500 feet of another community residence or shelter. 950 F. Supp. at 641. The defendants argue that this case is different from *Arc of New Jersey* because "Ordinance 966 permits a particular business, namely a Residential Treatment Center, in the Borough." Defs.' Br. at 52.

The court finds the defendants' argument concerning the permissive nature of Ordinance 966 unpersuasive for three reasons. First, the court is unaware of any case that dictates that permissive ordinances cannot be facially discriminatory. The parties have not brought any such cases to the court's attention.[8] Second, Ordinance 966 is permissive in that it permits parties to

---

[8] Rather, the defendants assert that it would be illogical for such a case to exist because a permissive ordinance could not be deemed irrational or arbitrary. *See* Defs.' Reply Br. in Supp. of Mot. for Summ. J. at 6, Doc. No. 30 (arguing that plaintiff made typographical error in arguing there is no legal authority for proposition that permissive ordinance can be facially discriminatory because lack of case on point "underscores" defendants' point).

The defendants pull this "irrational" or "arbitrary" language from *NHS Human Services v. Lower Gwynedd Township*, Civ. A No. 11-2074, 2012 WL 170740 (E.D. Pa. Jan 20, 2012). *See* Defs.' Br. at 48. In *NHS Human Services*, the court explained that "once a plaintiff shows that a statute is facially discriminatory or that a defendant's actions were motivated by a discriminatory purpose, it is up to the defendant to show that it had a legitimate, non-discriminatory reason for its actions and that no less restrictive course of action could be adopted." 2012 WL 170740, at *8. *NHS Human Services* did not entertain a facial claim, and, therefore, never applied the test it described to the type of claim contemplated here.

This is a proper articulation of the standard at its broadest level. However, tests to determine what constitutes a legitimate, non-discriminatory purpose vary based on the claim. If a plaintiff claims a regulation is facially discriminatory under the ADA and Rehabilitation Act, the court does not broadly ask whether the legislation is irrational or arbitrary. Rather, the court engages in the significant risk test. *See New Directions*, 490 F.3d at 305 (concluding statute was facially discriminatory and applying significant risk test). If a plaintiff argues the regulation is discriminatory under the ADA and Rehabilitation Act as it is applied to the plaintiff, "it is appropriate to inquire whether the public entity can make a reasonable accommodation for the disabled." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 345 (6th Cir. 2002). If the plaintiff brings an equal protection claim, "the plaintiff bears the burden of negating all conceivable rational justifications for the allegedly discriminatory action or statute." *New Directions*, 490 F.3d at 301.

build rehabilitation centers, but it provided a basis for the Borough Council to exclude the plaintiff's desired facility. Therefore, even if the defendants' initial premise was valid (which it is not), it would not justify granting summary judgment. Third, the permissive nature of Ordinance 966 has similarities to provisions at issue in other cases where courts deemed the provisions facially discriminatory. The court provides two examples of such provisions.

First, the court fails to see the supposedly sharp distinction the defendants attempt to draw between this case and *Arc of New Jersey*. In *Arc of New Jersey*, the conditional use provision *permitted* community residences or shelters housing seven or more persons but gave municipalities a means to deny such facilities' conditional use applications. 960 F. Supp. at 640. Second, in *Community Housing Trust v. Department of Consumer and Regulatory Affairs ("Community Housing")*, 257 F. Supp. 2d 208 (D.D.C. 2003), the District of Columbia required community-based residential facilities to obtain a certificate of occupancy. *Id.* at 213–14. The D.C. law defined a community-based residential facility as "a residential facility for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living." *Id.* at 213 (internal quotation marks omitted). The court concluded the requirement facially discriminated on the basis of disability despite the certificate process *permitting* the plaintiffs to obtain a certificate and open a community-based residential treatment facility. *Id.* at 229.

The instant case is similar to both *Arc of New Jersey* and *Community Housing* in that Ordinance 966 *permits* residential treatment centers. However, Ordinance 966 also establishes a way in which the Borough Council can deny conditional use applications specifically for residential treatment centers that provide outpatient methadone treatment. The fact that Ordinance 966 provides routes for parties to build residential treatment centers "in no way alters the fact that

---

The defendants' framing seeks to collapse the facial, as applied, and equal protection challenges. However, these tests are fundamentally different from one another and the court must honor and preserve their differences.

[Ordinance 966] facially singles out methadone clinics, and thereby methadone patients for different treatment[.]" *New Directions*, 490 F.3d at 304.

(b)      Significant/Substantial Risk

The defendants also fail to demonstrate that there are no contested issues of material fact as to whether the plaintiff's clients constitute a significant risk to the community. "Even when individuals would otherwise fall within the class of statutorily protected persons, . . . the ADA . . . exclude[s] individuals who pose a significant risk to the health or safety of others." *United States v. City of Baltimore*, 845 F. Supp. 2d 640, 649 (D. Md. 2012) (citations omitted). "[T]he significant risk test requires a rigorous objective inquiry." *New Directions*, 490 F.3d at 305. "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk of assessment must be based on . . . objective evidence." *Id.* (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998)). Thus, a court "cannot base [its] decision on the subjective judgments of the people purportedly at risk, the [West Easton] residents, [Borough] Council, or even Pennsylvania citizens, but must look to objective evidence in the record of any dangers posed by methadone clinics and patients." *Id.* at 306. The "purported risk must be substantial, not speculative or remote." *Id.*

Here, the defendants do not discuss the substantial risk test, instead explaining that the ordinance is not facially discriminatory because it is "rationally related to the Borough's legitimate state interest in promoting the health, safety, morals, and the general welfare of its citizens."[9] Defs.' Br. at 53. However, there is some evidence in the record as to why the defendants might perceive the plaintiff's clients to be a substantial risk. As described above, during a Council hearing

---

[9] As discussed in note 4, *supra*, even though the defendants appear to assert that they can defeat a claim of facial discrimination under the ADA and Rehabilitation Act by broadly demonstrating a legitimate, non-discriminatory purpose, this is not a proper characterization of the relevant inquiry.

to discuss the plaintiff's conditional use application, one Council member worried about the fact that the Borough does not have a police department yet, because a "riot" could break out in this "drug rehab" and there would not be anyone to call. Feb. 12, 2018 Hr'g at ECF pp. 95–96. He also worried about building "this thing in our town" because he wondered "[h]ow much is the property value going to hurt our taxpayers?" *Id*. at ECF p. 98. At a hearing on the plaintiff's second conditional use application, another Council member claimed "I'm concerned about [clinic clients] getting out, walking the streets. We got young children going to school. Young children playing in the yards. I'm not happy with that part." 2d Conditional Use Appl. Hr'g at 63:11–16.

Such concerns are insufficient to establish that there are no issues of material fact as to whether the plaintiff's clients would be a substantial risk to the community. While it is true that "some methadone patients" might be "inclined to criminal or otherwise dangerous behavior," such a broad characterization does not justify forbidding all methadone patients from receiving outpatient methadone treatments and imposing on all residential treatment patients a $150 fee. *New Directions*, 400 F.3d at 307. Therefore, based on the record, the court cannot grant the defendants' motion for summary judgment as it pertains to the plaintiff's facial discrimination claim brought under the ADA and Rehabilitation Act.

### iii.    The ADA and Rehabilitation Act As-Applied Claims

The plaintiff argues that the defendants applied Ordinance 966 in a manner that violates the ADA and Rehabilitation Act because their decision to deny the conditional use applications derived from a bias against individuals suffering from addiction who would seek out the services of the proposed treatment center. *See* Pl.'s Br. at 1 ("Defendants' actions were bigoted against people suffering from alcoholism and drug addiction. Defendant Borough Council members made and relied on prejudicial statements during the conditional use hearings and admitted their

decisions were based on unreasonable fears and prejudices."). Unlike facial claims that a plaintiff brings under the ADA and Rehabilitation Act, as-applied challenges differ for ADA and Rehabilitation Act claims. Although "Congress has directed the courts to construe the ADA and Rehabilitation Act such that conflicting standards do not arise, the ADA and the Rehabilitation Act are not exactly the same."[10] *New Directions*, 490 F.3d at 300 n.4 (internal citation omitted); *see K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) (explaining that "Title II's prohibition of discrimination or denial of benefits 'by reason of' disability 'establishes a

---

[10] Congress explicitly recognized this difference between Title II of the ADA and section 504 of the Rehabilitation Act:

> The House Committee Report explained the decision to leave 'solely' out of Title II as follows:
>
>> The Committee recognizes that the phrasing of section 202 in this legislation differs from section 504 [of the Rehabilitation Act] by virtue of the fact that the phrase "solely by reason of his or her handicap" has been deleted. The deletion of this phrase is supported by the experience of the executive agencies charged with implementing section 504 [of the Rehabilitation Act]. The regulations issued by most executive agencies use the exact language set out in section 202 in lieu of the language included in the section 504 statute.
>>
>> A literal reliance on the phrase "solely by reason of his or her handicap" leads to absurd results. For example, assume that an employee is black and has a disability and that he needs a reasonable accommodation that, if provided, will enable him to perform the job for which he is applying. He is a qualified applicant. Nevertheless, the employer rejects the applicant because he is black and because he has a disability.
>>
>> In this case, the employer did not refuse to hire the individual solely on the basis of his disability—the employer refused to hire him because of his disability and because he was black. Although the applicant might have a claim of race discrimination under title VII of the Civil Rights Act, it could be argued that he would not have a claim under section 504 [of the Rehabilitation Act] because the failure to hire was not based solely on his disability and as a result he would not be entitled to a reasonable accommodation.
>>
>> The Committee, by adopting the language used in regulations issued by the executive agencies, rejects the result described above.
>
> H.R.Rep. No. 485(II), 101st Cong., 2nd Sess., at 85 (1990). The Senate Committee Report contains a virtually identical passage. *See* S.Rep. No. 116, 101st Cong., 1st Sess., at 44–45 (1989).

*McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075 (11th Cir. 1996).

"motivating factor" causal standard for liability when there are two or more possible reasons for the challenged decision" whereas "the causal standard for the Rehabilitation Act is even stricter" (alteration omitted) (citing *Martin v. Cal. Dep't of Vet. Affairs*, 560 F.3d 1042, 1048–49 (9th Cir. 2009))). The required "causative link between discrimination and adverse action is significantly dissimilar" in the two statutes. *New Directions*, 490 F.3d at 300 n.4 (citation and internal quotation marks omitted). Discriminating against a qualifying individual "*solely by reason of her or his disability*" triggers the Rehabilitation Act's causative link. *Id.* (quoting 29 U.S.C. § 794). In contrast, discriminating against a qualifying individual "*by reason* of such disability" triggers the ADA's causative link. *Id.* (quoting 42 U.S.C. § 12132). "[T]he ADA clearly establishes that the 'sole reason standard' . . . is inapplicable to the ADA, which requires only but for causation." *Id.* (citation omitted).

The different causal standards of the ADA and the Rehabilitation Act present the court with a quandary. The notion that the ADA and the Rehabilitation Act bear different causal standards is not seemingly in harmony with the notion that "[w]hether [a] suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995) (citation omitted). Other courts have noted this discord without providing a remedy. *See, e.g.*, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) ("[T]there are important differences among these statutes" including "plaintiffs claiming intentional discrimination under the RA must show that they were discriminated against '*solely* by reason of [their] disability,' but the ADA requires only the lesser 'but for' standard of causation. . . . Undoubtedly there are other differences, but we leave them for another day." (internal citations omitted)). In *New Directions*, the Third Circuit discussed this distinction, citing *Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999). 490 F.3d at 300 n.4.

*Baird* recognizes the tension between the statutes and provides a partial analysis of the problem. *See* 192 F.3d at 469 ("Despite the overall similarity of § 12132 of Title II of the ADA and § 504 of the Rehabilitation Act, the language of these two statutory provisions regarding the causative link between discrimination and adverse action is significantly dissimilar."). *Baird* involved an action brought by a mother on behalf of her minor daughter against the daughter's former teacher, principal, and school board, alleging discrimination under Title II of the ADA and intentional infliction of emotional distress. *Id.* at 464. At the outset, the Fourth Circuit determined that "the ADA does not impose a 'solely by reason of' standard of causation." *Id.* at 469. Once the court "rejected a 'solely because of' standard, the question bec[ame] what causation standard applie[d]." *Id.* at 470. The court "conclude[d] that the causation standards applicable in Title VII actions are applicable to violations of § 12132." *Id.* The court reached this decision because

> [t]he remedies available for a violation of § 12132 are set forth in 42 U.S.C.A. § 12133 (West 1995), which in turn provides that "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 [of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132." *See* 42 U.S.C. § 12133.

*Id.* (second alteration in original). The court also pointed out that section 794a of Title 29 of the Rehabilitation Act provides that the remedies available under Title VII apply to ADA claims. *Id.* (citing 29 U.S.C § 794a(a)(1)).

The Fourth Circuit laid out this logic again in *A Helping Hand*:

> Title II creates a remedy for "any person alleging discrimination on the basis of disability" and provides that the "remedies, procedures, and rights" available under Title II are the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act]." *Id.* § 12133. Section 794a of the Rehabilitation Act, in turn, provides that the available "remedies, procedures, and rights" are those set forth in Title VII of the Civil Rights Act. 29 U.S.C. § 794a(a)(1) (2000).

515 F.3d at 362 (alteration in original). Because "Congress has directed courts to construe the ADA to grant *at least as much* protection as the Rehabilitation Act and its implementing regulations," the court determined that the Title VII standards applied to the ADA claims before it. *Id.* (emphasis added).

Because *Baird* and *A Helping Hand* did not involve a Rehabilitation Act claim, the Fourth Circuit did not address how this analysis impacts the Rehabilitation Act causation standard. Nonetheless, because the court's decision that the ADA employed the same standards as Title VII derived from the fact that the Rehabilitation Act sets forth the "remedies, procedures, and rights" of a person alleging discrimination in violation of the ADA, the only logical conclusion is that Title VII standards also guide the Rehabilitation Act analysis. *Cf. Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999) ("Under the Rehabilitation Act, an aggrieved federal employee is entitled to the 'remedies, procedures, and rights' set forth in Title VII of the Civil Rights Act." (quoting 29 U.S.C. 794a)). Therefore, the court will employ a Title VII framework in analyzing both the ADA and Rehabilitation Act claims in this case. This approach comports with other courts which have analyzed both types of claims under the same analysis. *See, e.g.*, *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City ("Cinnamon Hills")*, 685 F.3d 917, 919 (10th Cir. 2012) (Gorsuch, J.) (remarking that "[w]hatever the statutory rubric, though, everyone agrees that to avoid summary judgment" plaintiff pursuing claims under ADA and Rehabilitation Act must meet same standards); *Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202, 205 (2d Cir. 2010) (explaining plaintiff can bring disparate treatment, disparate impact, or reasonable accommodation claim); *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) ("Plaintiffs who allege violations under the ADA, the F[air Housing Act], and the Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate

impact, and failure to make reasonable accommodation."); *Wilf v. Bd. of Regents of the Univ. Sys. of Ga.*, Civ. A. File No. 1:09-cv-1877-RLV-GGB, 2012 WL 12888680, at \*17 (N.D. Ga. Oct. 15, 2012) ("A disability discrimination (under the ADA and/or the Rehabilitation Act) can be based on either a conventional 'disparate treatment' theory, or a theory that the defendant failed to make 'reasonable accommodations' or both." (citations omitted)); *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 823 (W.D. Pa. 2010) ("Statutory claims brought against zoning authorities under the FHA, the Rehabilitation Act and the ADA may proceed under a 'disparate treatment,' 'disparate impact' or 'reasonable accommodation' theory." (citing *Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 522 (W.D. Pa. 2007))).

Under either the ADA's or the Rehabilitation Act's "statutory rubric, . . . everyone agrees that to avoid summary judgment [the plaintiff] must present facts suggesting that the [defendants] either (1) intentionally discriminated against the disabled, (2) engaged in conduct that had an unlawful disparate impact on the disabled, or (3) failed to provide a reasonable accommodation for the disabled." *Cinnamon Hills*, 685 F.3d at 919; *see* Defs.' Br. at 50–56 (identifying plaintiff's claims as disparate impact and disparate treatment); Pl.'s Br. at 14 ("Defendants correctly identify Plaintiff's ADA and Rehabilitation Act claims as disparate treatment and disparate impact claims."); *see also McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997) ("Not surprisingly, most of the law that has been made in" cases plaintiffs bring under both the ADA and the Rehabilitation Act have "arisen in the context of employment discrimination claims, but we have no doubt that the decisional principles of these cases may be applied to this case.").[11] Here, the plaintiff makes clear it seeks to establish a disparate treatment and disparate impact claim. Pl.'s Br. at 14.

[11] Based on this court's review, it seems the Third Circuit has indicated that these are the three ways to mount as-applied ADA and Rehabilitation Act challenges in cases that also implicate the Fair Housing Act. *See Lapid-Laurel,*

36

The court's analysis of the as-applied ADA and Rehabilitation Act challenges proceeds in two parts. First, the court provides an overview of the disparate treatment and disparate impact theories. Second, the court considers whether the defendant is entitled to summary judgment on the plaintiff's as-applied ADA and Rehabilitation Act claims. The court concludes that the defendants are not entitled to summary judgment on the as-applied claims because disputed issues of material fact remain as to their motivation to deny the plaintiff's conditional use applications.

(a)     An Overview of As-Applied ADA Claims Through the Disparate Treatment and Disparate Impact Theories

(1)     Disparate Treatment

"To prove disparate treatment, the plaintiff must show the defendant in fact intended to discriminate or was improperly motivated in making the discriminating decision." *Caron*, 879 F. Supp. 2d at 1367 (citation omitted). A plaintiff can prove disparate treatment in two ways. First, a plaintiff can show direct proof of the defendants' discriminatory intent. *Cinnamon Hills*, 685 F.3d at 919 (citations omitted). "Direct evidence of discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption." *Id.* (citations omitted). Therefore, if a "zoning official . . . makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination." *Id.* at 920 (citation omitted). If a plaintiff produces direct evidence of discrimination, the defendant "must then produce evidence

---

*LLC v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 448 n.3 (3d Cir. 2002) (citing 42 U.S.C. § 3604(f)(3), which specifically addresses discriminatory housing practices to support contention that "Plaintiff may bring three different types of claims against municipal land use authorities under the FHAA"); *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170 (3d Cir. 2005) (employing variation of this test in context of FHAA claims). However, the Third Circuit had no occasion to delineate these three ways of proving an as-applied challenge in *New Directions*—its seminal case that concerned only ADA and Rehabilitation Act claims without any FHA claims— because the court concluded that the statute was facially discriminatory and did not reach the merits of the as-applied challenge. Nevertheless, this court sees no reason why the lack of a FHA claim in this case would render these three approaches inapplicable in this case.

sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995).

Second, if a plaintiff does not have direct evidence, the plaintiff can "point[] to circumstantial evidence and invoke[] the familiar *McDonnell Douglas* burden shifting scheme originally spawned in the Title VII arena but long since equally entrenched in the . . . ADA[] and RA contexts." *Cinnamon Hills*, 685 F.3d at 919 (citations omitted). Under this approach, the plaintiff "bears the obligation of coming forward with a *prima facie* case of discrimination, a case that must include evidence suggesting the city denied the variance *because of* the disability of" the plaintiff's clients. *Id.* at 920. To meet this initial burden, the plaintiff "must produce evidence suggesting that" the defendants "denied to it zoning relief granted to similarly situated applicants without disabilities." *Id.* In the event that "there are no similarly situated non-disabled applicants, [the plaintiff] must show the circumstances surrounding the denial" of the conditional use applications "support a reasonable inference that the city would have granted to an applicant without disabilities the relief it denied [the plaintiff]." *Id.* If the plaintiff makes a *prima facie* showing of discrimination, the burden shifts to defendants to provide a legitimate, nondiscriminatory reason for the challenged action. *Hispanic Counseling Ctr., Inc. v. Incorp. Vill. of Hempsted*, 237 F. Supp. 2d 284, 293 (E.D.N.Y. 2002).

(2)     Disparate Impact

"Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." *Cinnamon Hills*, 685 F.3d at 922. "In order to establish a prima facie case of disparate impact, the plaintiff must provide evidence showing (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on

38

persons of a particular type produced by the defendant's facially neutral acts or practices." *Quad Enters. Co., LLC*, 369 F. App'x at 206 (citation and internal quotation marks omitted). "Although the plaintiff need not show discriminatory intent under this theory, it must prove that the practice actually or predictably results in discrimination." *Id.* (alteration and internal quotation marks omitted). "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Cinnamon Hills*, 685 F.3d at 922 (alteration, internal quotation marks, and citation omitted).

(3)     The Defendants are Not Entitled to Summary Judgment on the Plaintiff's As-Applied ADA and Rehabilitation Act Claims

The plaintiff presents a viable ADA and Rehabilitation Act claim under the first disparate treatment theory, such that it overcomes the defendants' motion for summary judgment on the statutory as-applied claims. There are contested issues of material fact that could lead a reasonable factfinder to conclude that the defendants' discriminatory intent was the "but-for" or "sole" cause of their decision to deny the conditional use applications. *New Directions*, 490 F.3d at 300 n.4; *see Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 130–31 (3d Cir. 2002) ("An issue is genuine if a reasonable jury could possibly hold in the nonmovants favor on that issue."). In rendering this decision, the court first determines that there is a triable issue of material fact as to whether the defendants had discriminatory intent in the way in which they implemented Ordinance 966. Second, the court determines that there is a triable issue of material fact as to whether the defendants "produce evidence sufficient to show that [they] would have made the same decision if illegal bias had played no role" in their decision to deny the conditional use applications. *Starceski*, 54 F.3d at 1095 n.4.

(A)     There is a triable issue of material fact as to whether the defendants had discriminatory intent in the manner in which they implemented Ordinance 966

The record is riddled with "zoning official[s] . . . mak[ing] discriminatory comments about the disabled while explaining [their] basis for the contested decision," which "is direct evidence of discrimination" because it "is evidence which, if believed, proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption." *Cinnamon Hills*, 685 F.3d at 919–20. The mayor who signed Ordinance 966 into law said "there's no reason why a druggie gets better treatment than a D. U. I. [sic] person in the jail over there. As far as I'm concerned, they're no different and they're treated so loosely, it's unbelievable." Feb. 12, 2018 Hr'g at ECF p. 164. The former mayor indicated there should be "a hundred or 200 foot restriction" on placing the clinic in a residential area. *Id.* at ECF p. 165. As explained previously, one Council member expressed concern that a "riot" could break out in this "drug rehab" and there would not be anyone to call. *Id.* at ECF pp. 95–96. He also worried about building "this thing in our town" because he wondered "[h]ow much is the property value going to hurt our taxpayers?" *Id.* at ECF p. 98. Another Council member claimed "I'm concerned about [clinic clients] getting out, walking the streets. We got young children going to school. Young children playing in the yards. I'm not happy with that part." 2d Conditional Use Appl. Hr'g at 63:11–16.

The Borough Council denied the first conditional use application on March 20, 2018. Defs.' Facts at ¶ 23; Pl.'s Resp. at ¶ 23; Decision at ECF pp. 75–92. After the meeting, the Council Vice President wrote to his fellow Council members to express concern that "no better example of [Not in My Back Yard] can be found[] than that which [he] heard from the public who spoke at the three Conditional Use Hearings" because "the public made statements of drug addicts escaping and breaking into homes, them wandering the streets looking for drugs, children's safety, riots,

mass exodus, and a host of other *unreasonable* fears and prejudices." Pl.'s Ex. 7 at 1. Each of these

statements requires no "further inference or presumption" to demonstrate discriminatory intent.

*Cinnamon Hills*, 685 F.3d at 919.

As Dr. Dominic Marfisi, a health psychologist specializing in addiction, testified during

his deposition,

> I have never been -- and I have attended several, at least a dozen, types of hearings
> in Pennsylvania, and I have never been faced with such bias as I have in West
> Easton Borough with both the individuals at the table -- yourself not included --
> and the audience. I get it from the audience. Most people are afraid. They're scared.
> They don't know what to expect. They think they know what to expect, but they
> have never run a program. They have never had me oversee a program.
>     I was really taken aback and insulted by some of the reactions of the board
> on a lot of the questions, inferences, and biased statements that were made. And I
> just wanted to make that part of my statement because individuals who would be in
> this program suffer from a disease, a debilitating disease and have every right to
> receive treatment like anyone else in any other healthcare facility. And I just --
> believe the stigma has to stop regarding individuals who have mental health and
> drug and alcohol disorders.

Pl.'s Ex. 13, Dep. of Dominic Marfisi, Ph.D. ("Marfisi Dep."), at 78–80, Doc. No. 25.

(B)    There is a triable issue of material fact as to whether the defendants produced evidence
       showing that they would have denied the conditional use applications if bias played no role

Because the plaintiff provides direct evidence of discriminatory intent, the defendants must

"produce evidence sufficient to show that [they] would have made the same decision if illegal bias

had played no role" in their decision to deny the conditional use applications. *Starceski*, 54 F.3d

at 1095 n.4. The defendants provide four primary non-discriminatory reasons for why they denied

the plaintiff's conditional use applications: (1) a representative of the plaintiff helped draft

Ordinance 966, Defs.' Br. at 9; (2) the conditional use applications objectively did not meet

Ordinance 966's criteria, *id.* at 21; (3) the defendants did not want the plaintiff to "bootstrap[] . . .

one use (a methadone clinic) to another (a Residential Treatment Center) without the opportunity

[to] ensure the determination of appropriate zoning requirements for the separate use and evaluate

Plaintiffs [sic] compliance the same[,]" *id.* at 8; and (4) the defendants had concerns about the way in which the plaintiff would operate a new facility, given the way in which the plaintiff's principal operates the DUI Center. *See id.* at 10 ("The atmosphere in which this conditional use application was brought was one where the Borough had, for several years, experienced security-related issues at Plaintiff's DUI Center on the same parcel of land.").

In regard to the first articulated reason, the fact that a representative of the plaintiff helped draft the ordinance is insufficient. "Although the defendants have attempted to shift blame for the language of this provision to the group that proposed it, the [defendants] ultimately had to approve" the language and were the only ones who decided to deny the plaintiff's conditional use applications. *First Step, Inc.*, 247 F. Supp. 2d at 150–51.

The defendants' second non-discriminatory reason for denying the conditional use applications is because the plaintiff did not meet the criteria set out in Ordinance 966 in any of its conditional use applications. The court finds that there are contested issues of material fact as to whether the plaintiff's second and third conditional use applications objectively failed to meet Ordinance 966's criteria, such that the defendants had to deny them.

In this regard, Judge Sletvold explained that the defendants denied the plaintiff's second conditional use application because

> The Board found that [the plaintiff] failed to satisfy three of the fourteen criteria in the Ordinance applicable to this conditional use, specifically: 1) [the plaintiff] failed to maintain 24-hour security 7 days per week and 365 days per year; 2) [the plaintiff] failed to maintain a perimeter boundary fence at a minimum of six feet high, subject to the final approval of the Borough Council; and 3) [the plaintiff] failed to require any residents entering or leaving the proposed Residential Treatment Center to be picked up and dropped off by a third party through a secured process to prevent entry to and discharge into the public.

Opinion at 7.

Judge Sletvold's opinion addressed each of these alleged failures. She found that "the Borough conceded that the testimonial evidence provided to [it] at the May 14, 2018 hearing satisfies the plain language of the requirement set forth" in the security subsection of Ordinance 966, and, therefore the first issue was "moot." *Id.* at 8 (footnote omitted). On the issue of the fence, Judge Sletvold concluded that "the Borough did not commit an abuse of discretion or error of law" in deciding that the plaintiff might fail to maintain a six foot high fence around the facility. *Id.* at 11. On the issue of secure pick up, Judge Sletvold found "[t]he Ordinance does not require such drastic measures" as locking residents into the treatment center, but that it "merely requires that any resident who wishes to leave must be picked up by a third party." *Id.* at 14. Judge Sletvold found the plaintiff "was not going to be compliant with this requirement set forth in the Ordinance" and, therefore, "the Borough did not commit an abuse of discretion or error of law in denying the requested conditional use on this basis." *Id.*

In the third conditional use application, the plaintiff seemingly addressed each of the concerns discussed in Judge Sletvold's opinion. The application specifically indicated "there will be a perimeter fence around the treatment center as per Judge Sletvold's April 22, 2019 opinion." Pl.'s Ex. 6 at 7 (emphasis omitted). The application also specifically indicated that "West Easton Treatment Center shall have a third-party bonded security agency to provide security for the facility and the premises as per Judge Sletvold's April 22, 2019 opinion." *Id.* at 2 (emphasis omitted). Members of the Borough Council acknowledge that the third conditional use application conformed to Judge Sletvold's opinion. Dees Dep. at 68:18–25–69:2–6; Breidinger Dep. at 56:1–25. Nonetheless, the defendants denied the third conditional use application. One Council member testified that the Board denied the application because "the facility was not locked", because of

"an uneducated fear" of "treatment facilities", and out of "fear of who would run" this treatment facility. Dees Dep. at 69:7–14.

The plaintiff appealed the decision to deny the third conditional use application, but Judge Sletvold did not issue an opinion on this application because the defendants agreed to withdraw their decision to deny the application. Defs.' Suppl. Br., Ex. A. At bottom, the defendants have not produced sufficient evidence as to the second purported non-discriminatory reason to demonstrate they "would have made the same decision if illegal bias had played no role in the employment decision." *Starceski*, 54 F.3d at 1095 n.4.

The defendants' third non-discriminatory reason for denying the conditional use applications is that they were concerned about the plaintiff potentially attempting to "bootstrap[] one use (a methadone clinic) to another (a Residential Treatment Center) without the opportunity [to] ensure the determination of appropriate zoning requirements for the separate use and evaluate Plaintiffs [sic] compliance the same." Defs.' Br. at 8. However, the defendants do not demonstrate that this reason is not, in fact, discriminatory. The defendants decided to police only the administration of outpatient methadone. They provide no justification for why methadone is so distinct from other medications that they must prevent the bootstrapping of methadone treatment as opposed to any other medical treatment. In the context of the discriminatory remarks made at the conditional use hearings (*i.e.* calling patients of the residential treatment center "druggies" and "criminals"), there is a question of material fact as to whether the defendants singled out outpatient methadone treatment in this way out of fear of those who might rely on methadone treatment.

The defendants' fourth non-discriminatory reason for denying the conditional use applications is that they had concerns about the manner in which the plaintiff would run the new facility because of the way in which the DUI Center (owned by Mr. Atiyeh, who also operates the

plaintiff) carries out its business. At the conditional use hearings, some expressed concern about the DUI Center street parking and worried that an additional facility in the same location might exacerbate the problem. Feb. 12, 2018 Hr'g at ECF pp. 123–25 ("I've lived here [for] 28 years and until that D. U. I. [sic] center was put in, parking has never been an issue. . . . There are seven houses on our block, and I walked two blocks the other night over the weekend. . . . I'm seven houses, two unoccupied, nine houses in this bloc; two aren't occupied and we can't park."). However, in a different line of discussion, members of the public voiced anxieties related to safety attributable to the DUI Center. For instance, one member of the public (a brother of a Council member) explained

> If [the new facility] is run anything like the D. U. I. [sic] center, there's more prisoners out at eleven o'clock at night smoking cigarettes on the street than -- and you're saying they can walk out that front door [of the new facility]. In other words, I should probably put a pistol under the pillow because if I wake up in the middle of the night, I might have a guy just sitting there that's going to stab me. Because if he's got access to walk out at any time, he can break into anybody's house.

*Id.* at ECF pp. 121–22. Then-Mayor Gerald Gross also voiced safety concerns that linked the DUI Center to the residential treatment center: "[T]here's no damn reason why a druggie gets better treatment than a D. U. I. [sic] person in the jail over there. As far as I'm concerned, they're no different and they're treated so loosely, it's unbelievable." *Id.* at ECF p. 164. Based on these statements, there is an issue of disputed material fact as to whether the defendants' concerns surrounding the connection between the DUI Center and the residential treatment center are actually rooted in animus towards disabled individuals who struggle with drug and alcohol addictions.

After an evaluation of the defendants' reasoning, the court concludes there is a triable issue of material fact as to whether they "would have made the same decision if illegal bias had played no role" in their decision to deny the conditional use applications. *Starceski*, 54 F.3d at 1095 n.4.

Because the court concludes that these statements are sufficient to demonstrate there is an issue of material fact as to whether the defendants harbored discriminatory intent, the court need not assess the viability of the plaintiff's claim under the second disparate intent route and examine whether it can sustain a prima facie case under the *McDonnell Douglas* framework. Similarly, the court need not assess the viability of the plaintiff's claim under the disparate impact theory.

b.     Constitutional Claims

The Fourteenth Amendment forbids "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law" and from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The plaintiff brings both facial and as-applied substantive due process and equal protection claims. It claims the defendants violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment facially in Ordinance 966 and as they applied this ordinance to it. *See* Pl.'s Br. at 13 ("Plaintiff Treatment Center alleges violations of the 14th Amendment Guarantees of Due Process and Equal Protection because Ordinance 966 is unconstitutional on its face and as applied to Plaintiff's proposed Treatment Center (Count I).").

*i.     Equal Protection*

The analysis of the equal protection claim first provides an overview of the standard in an equal protection challenge, and, second, applies this standard to this case. The court denies the defendants' motion for summary judgment on the plaintiff's facial and as-applied equal protection claims.

(a)     The Equal Protection Standard

Under the Equal Protection Clause, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "However, courts are reluctant

to overturn governmental action on the ground that it denies equal protection of the laws [because] '[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will be rectified by the democratic process and that judicial intervention is generally unwarranted[.]'" *Congregation Kol Ami*, 309 F.3d at 133 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). "Generally, to state a claim for violation of the [E]qual [P]rotection [C]lause of the 14th Amendment, the plaintiff must allege membership in a protected class that has been singled out for unequal treatment by the government." *Schneider v. Cnty. of Will*, 190 F. Supp. 2d 1082, 1093 (N.D. Ill. 2002). Such protected classes (also called "suspect" and "quasi-suspect" classes) include race, alienage, national origin, religion, gender, and legitimacy of birth. *See City of Cleburne*, 473 U.S. at 440–41 (discussing protected classes).

"Like other economic and social legislation, land use ordinances that do not classify by race, alienage, or national origin will survive an attack based on the Equal Protection Clause if the law is reasonable, not arbitrary and bears a rational relationship to a (permissible) state objective." *Congregation Kol Ami*, 309 F.3d at 133 (internal quotation marks omitted). A court will deem "[l]and use ordinances . . . 'irrational' when a plaintiff demonstrates *either* that the state interest is illegitimate (an ends-focus) *or* that the chosen classification is not rationally related to the interest (a means-focus)." *Id.*

To understand whether a land use ordinance that does not classify by race, alienage, or national origin violates the Equal Protection Clause, a court engages in a two-step analysis. First, the court considers whether the plaintiff is similarly situated to the other uses that the ordinance allows. *Id.* at 136–38. Second, the court considers whether "there was no rational reason behind the differential treatment of the similarly situated uses[.]" *Id.* at 137. "This two-step inquiry properly places the initial burden on the complaining party first to demonstrate that it is 'similarly

situated' to an entity that is being treated differently before the local municipality must offer a justification for its ordinance." *Id.*

The first step requires "determining whether parties are similarly situated," which is a fact-intensive inquiry," so "summary judgment on this ground is warranted only where no reasonable jury could find that the persons to whom the plaintiffs compare themselves are similarly situated." *Spiegel v. Adirondack Park Agency*, 662 F. Supp. 2d 243, 253 (N.D.N.Y. 2009) (alterations, citation, and internal quotation marks omitted). "Two persons or entities are similarly situated if a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant aspects." *Locust Valley Enters., LLC v. Upper Saucon Twp.*, Civ. A. Nos. 07-3059, 07-4305, 2008 WL 2719588, at *12 (E.D. Pa. July 11, 2008) (alterations in original) (quoting *Clark v. Bosher*, 514 F.3d 107, 114 (1st Cir. 2008)). The inquiry is not whether two uses have a similar *impact*. "[I]f [a court] were to conclude . . . that all uses with a similar impact must be treated alike, regardless of the fact that such uses may be fundamentally distinct, [the court] would turn zoning law on its head" because "such a conclusion would mean . . . that a host of . . . uses that impact [particular conditions] *must* also be permitted in zones" that permit other uses with those same impacts. *Congregation Kol Ami*, 309 F.2d at 139 (emphasis added). This result "would strip of any real meaning the authority bestowed upon municipalities to zone since the broad power to zone carries with it the corollary authority to discriminate against a host of uses that a municipality determines are not particularly suited for a certain district." *Id.*

If the court reaches the second step, the plaintiff bears a similarly high (if not higher) burden "of negating all conceivable rational justifications for the allegedly discriminatory action

or statute[.]" *New Directions*, 490 F.3d at 301.[12] This heavy burden is distinct from the "far different and more skeptical inquiry under the ADA and Rehabilitation Act[,]" *id.*, because the Fourteenth Amendment does not require public entities to accommodate the needs of those who constitute "qualifying individuals" under the ADA and Rehabilitation Act, given that disability is not a suspect or quasi-suspect classification of the Equal Protection Clause. *McKivitz*, 769 F. Supp. 2d at 831.

To succeed in this second step, a plaintiff must demonstrate "that the handicap- or disability-based discrimination alleged to have occurred was truly irrational." *Id.*; *see New Directions*, 490 F.3d at 311 ("[C]lassifications based on disabled individuals, such as recovering heroin addicts, are reviewed under the rational basis test which requires a rational means to serve a legitimate end."). In reviewing whether a legitimate state interest exists, courts may "consider any conceivable legislative purpose so long as it reasonably could have been entertained by the legislature." *Ramsgate Ct. Townhome Ass'n v. W. Chester Borough*, 313 F.3d 157, 160 (3d Cir. 2002) (citation omitted). "Although a finding of bare animus towards a group or 'fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding,' is not necessary for a zoning ordinance to fail under an equal protection challenge, such evidence is likely sufficient." *Congregation Kol Ami*, 309 F.3d at 135 (quoting *City of Cleburne*, 473 U.S. at 448).

---

[12] This heavy burden persists whether the plaintiff brings an as-applied or facial challenge. *See New Directions*, 490 F.3d at 301 ("The principal difference between the equal protection and the ADA inquiry is that in an as applied *or* facial equal protection challenge, the plaintiff bears the burden of negating all conceivable rational justifications for the allegedly discriminatory action or statute." (emphasis added)). But, in an as-applied challenge, the burden applies to a narrower swath of behavior than it does in a facial challenge. "When a litigant brings a facial challenge, he or she must show that the regulation is unreasonable in all of its applications, whereas in an as-applied challenge, she must show only that it is unconstitutional as applied to her property." ERIC M. LASSON, CAUSE OF ACTION AGAINST MUNICIPALITY FOR INVALID OR DISCRIMINATORY LAND USE OR ZONING REGULATION BASED ON CLASS-OF-ONE VIOLATION OF EQUAL PROTECTION, 51 COA2d 91, IIIB§ 22 (2020). Because the court concludes that there is a triable issue of material fact as to whether the defendants' reasoning in enacting Ordinance 966 was rational, the court braids the as-applied and facial analyses together.

(b)      Application

The court applies this two-step analysis to this case. First, the court asks whether the plaintiff is similarly to situated to any of Ordinance 966's other permitted uses that are not required to meet the 14 criteria that it mandates residential treatment centers, like the plaintiff, must meet. The court concludes that "a prudent person, looking objectively at the incidents [complained of]," could find the plaintiff is similar to an assisted living facility and to the DUI Center—two entities which are not subject to Ordinance 966's 14 criteria. *Locust Valley Enters., LLC*, 2008 WL 2719588, at *12 (alteration in original) (internal quotation marks omitted). Second, the court considers whether there is a triable issue of material fact as to whether the defendants' reasons for enacting Ordinance 966 and applying it to deny the plaintiff's conditional use applications were rational. The court concludes that there is an issue of triable fact as to whether these reasons were rational.

(1)      There Is a Triable Issue as to Whether the Plaintiff Is Similarly Situated to Other Entities in the Light Industrial Zoning District

The court finds that there is a triable issue of material fact as to whether the plaintiff is similarly situated to assisted living facilities and to the DUI Center.[13] Assisted living facility

---

[13] The plaintiff contends that the proposed facility is similarly situated to "other uses for which Defendants do not require security, temporary residence fees, and limitations on medicines" including "daycare centers, group homes, assisted living facilities, [and] apartments to provide housing for older persons." Pl.'s Br. at 24–25 (citation omitted). While daycare centers and group homes may have some similarities to the plaintiff's proposed facility, they lack one fatal commonality: the Zoning Code does not zone for them in the Light Industrial Zoning District. Instead, the Zoning Code permits daycare centers in the Residence Use District. Zoning Ordinance at 36. The Zoning Code permits group homes in areas where they are "permitted by this Ordinance," but Ordinance 966 does not mention group homes. *Id.* at 82.

The plaintiff cites *Open Homes Fellowship, Inc. v. Orange County*, 325 F. Supp. 2d 1349 (M.D. Fla. 2004), *see* Pl.'s Br. at 24, and would, therefore, seem to acknowledge that a portion of the relevant inquiry in deciding if one entity is similarly situated to another is whether that entity can permissibly locate in a particular zoning district. *Open Homes* involved a religious institution that ran a recovery program for men experiencing addiction issues. 325 F. Supp. at 1352. The Open Homes facilities fell into zone R-3, or the "Multiple Family Dwelling District." *Id.* at 1353. According to the zoning code, the Multiple Family Dwelling District permitted "multiple-family dwellings, boarding and lodging houses, kindergartens and day nurseries, dormitories, fraternity and sororities houses, family foster homes, community residential homes with no more than 14 clients, and single family dwelling transient rentals." *Id.* The county denied Open Homes' application for a special exception and Open Homes brought suit challenging the zoning

residents do not need to pay a $150 temporary residence fee and are not limited in the types of treatment they can receive. DUI Center residents must pay a $150 temporary residence fee, *see* Defs.' Ex. K (instituting a $150 temporary residence fee), but they are not limited in the types of treatment they can receive.

To determine which entities could be similarly situated to the plaintiff, the court must examine what other entities the Zoning Code permits in the district in which the plaintiff seeks to establish the residential treatment facility. As explained in the portion of this opinion analyzing the facial ADA and Rehabilitation Act claims, Ordinance 966 amends section 701 of the Zoning Code, which regulates the Borough's Light Industrial Zoning District. Zoning Ordinance at 45. Section 701 provides that certain buildings are "uses-by-right." *Id.* These uses-by-right include "Assembly of office equipment and electrical application and supplies;" "Manufacturing of light industrial products from already prepared materials . . . [or] of professional, scientific, or electrical improvements; jewelry; watches and similar products;" "Research, engineering, or testing laboratories;" "Public utility operating facilities;" "Printing or publishing establishments;" "Office building;" and "Wholesale warehouse, and distribution." *Id.* at 45–46. Section 701 also provides for several "special exception uses" that allow "[a] building or other structure [to be] erected, altered or used for any one of the following uses when authorized as a special exception by the Zoning Hearing Board." *Id.* at 46. These other uses include "[m]otor vehicle body or fender repair;" "[a]utomobile service station;" and "[u]ses similar to those permitted by special exception." *Id.*

---

code and the denial of the special exception under the Equal Protection Clause (among other claims). *Id.* at 1354–55. The district court concluded that the other facilities in the Multiple Family Dwelling District that "do[] not require special permits—*inter alia* community residential homes, adult daycare centers, and dormitories—are similarly situated to Open Homes' use as a drug and alcohol rehabilitation center" such that "but for the fact that Open Homes' residents are recovering drug and alcohol addicts, if Plaintiff was operating its Program as any of these other uses it would be allowed in an R-3 zone as of right." *Id.* at 1357–58.

Obviously, a residential treatment center is dissimilar from any of these uses, which focus on production, manufacturing, and service stations. Section 701 does not focus solely on production, manufacturing, and service stations, however. Instead, Ordinance 966 amends section 701 to provide that one of the stated "purposes" of the Light Industrial Zoning District is

> [t]o provide for adaptive reuse of structures formerly used for light industrial purposes to include Assisted Living Facilities, Residential Treatment Centers, Residential DUI Treatment Centers, and multi-family dwellings (apartments) to provide housing for older persons and other persons needing assistance, the infirmed, affordable unsubsidized housing, and to provide facilities to decrease recidivism.

Ordinance 966 at ECF p. 206.

In the spirit of achieving this purpose of the Light Industrial Zoning District, Ordinance 966 amends section 701 to permit residential treatment centers as a conditional use in that district, so long as those residential treatment centers conform to 14 criteria. The ordinance's capacious definition of residential treatment centers encompasses a wide array of possible facilities. Residential treatment centers are facilities "whose primary function is to temporarily house individuals for the purpose of receiving medical, psychological, or social treatment and/or counseling." *Id.* The "Assisted Living Facilities, . . . Residential DUI Treatment Centers, and multi-family dwellings (apartments) to provide housing for older persons and other persons needing assistance, affordable unsubsidized housing, and to provide facilities to decrease criminal recidivism" do not need to meet the same 14 criteria that the residential treatment facilities need to meet. *Id.*

There is a triable issue of material fact as to whether assisted living facilities and residential DUI treatment centers are similarly situated to the plaintiff's proposed facility. Though the court cannot locate a definition for an assisted living facility in either the Zoning

Code or Ordinance 966, it would seem that, much like a residential treatment center, the purpose of an assisted living facility is to "temporarily house individuals for the purpose of receiving" some kind of treatment and aid. *See, e.g.*, *Mont. Fair Hous., Inc.*, 854 F. Supp. 2d at 837 ("The parties stipulate that an assisted living facility provides housing opportunities for persons with disabilities and the elderly."); *cf. Bethlehem Manor Village, LLC v. Zoning Hr'g Bd. of City of Bethlehem*, No. 2258 C.D. 2011, 2012 WL 8704111, at *3–4 (Pa. Commw. July 5, 2012) (explaining that City of Bethlehem's zoning ordinance defined "Assisted Living Facility" as "a facility which provides, on a regular basis, housing, limited health care, and specialized assistance with daily living to individuals who do not need care within a hospital or nursing home, but who need such care because of their advanced age, physical or mental handicap or illness"). Ordinance 966 does not provide any limitation on the types of medication an assisted living facility can administer or the manner in which the facility can administer medication. Further, Ordinance 966 does not impose any sort of temporary residence fee on the residents of an assisted living facility. The primary difference between an assisted living facility and the plaintiff's proposed treatment facility is that those temporarily residing at the treatment facility struggle with addiction to substances. However, if that is the distinction that motivates the defendants to enact the $150 fee and limitation on outpatient methadone treatment, Ordinance 966 may be found irrational (as the court will discuss in the subsequent section).

The DUI treatment center also bears a similarity to the plaintiff's proposed facility—a fact that even the defendants acknowledge. *See* Defs.' Br. At 45 ("A Residential Treatment Center may be most similar to a Residential DUI Center in that both uses are of a transitory residential nature, and both uses serve populations with substance abuse issues."). The DUI

treatment center is "[a] residential facility that provides housing, supervision and counseling for persons approved in writing to reside in such a facility . . . and who reside in such a facility because [of] an arrest for driving under the influence (DUI) for persons needing treatment because of addiction to alcohol." Ordinance 885 at ECF p. 201. This definition maps almost perfectly onto Ordinance 966's definition of a residential treatment facility as a facility that "temporarily house[s] individuals for the purpose of receiving medical, psychological, or social treatment and/or counseling." Ordinance 966 at ECF p. 206. Further, as Dr. Marfisi testified during the February 12, 2018 conditional use hearing, some individuals may report to the plaintiff's proposed treatment center under court order, much like those who report to the DUI Center. Marfisi Dep. At 150:12–23. Based on this record, the court concludes that "a prudent person, looking objectively at the incidents [complained of]," could find the plaintiff is similarly situated to the DUI treatment center. *Locust Valley Enters., LLC*, 2008 WL 2719588, at *12. Both facilities temporarily house and treat individuals who struggle with addiction and provide this population with services.

Ordinance 885 (which governs Residential DUI treatment centers)[14], Ordinance 966, and the Zoning Code do not police the types of treatments the DUI Center can administer or the manner in which the Center can administer those treatments. However, Ordinance 885 compels residents at the DUI Center to pay a $150 temporary residence fee. Ordinance 885 at ECF p. 201 ("The fee imposed upon any temporary resident within the Residential DUI Treatment Facility shall be $150."). The defendants readily admit that this $150 fee only applies to the DUI Center, not to

---

[14] The defendants indicate that "Ordinance 885 is to some extent sloppily drafted, because the preamble indicates that at the time, the Borough was considering amending its Zoning Ordinance 'to include Assisted Living Facilities, Personal Care Homes, and Residential DUI Treatment Facilities[,]' and 'adding regulations for such uses'" but "as drafted, Ordinance 885[] only applied the temporary residence fee to the temporary residents of the DUI Center." Defs.' Br. at 15 n.14. The court agrees with the defendants that the plain language of Ordinance 885 does not apply the parameters of the ordinance to any facility beyond the DUI Center.

other facilities. *See* Defs.' Br. At 15 n.14. As explained in the subsequent section, the court cannot discern the defendants' rational basis for only subjecting the DUI Center residents and treatment center residents to a $150 fee. If the unifying feature upon which the defendants base this decision is that both of these facilities house individuals with addictions, the defendants' justification is irrational because it is based on animus.

(2)     There Is a Triable Issue of Material Fact as to Whether Ordinance 966 Is Arbitrary and Irrational

The plaintiff highlights evidence of disability animus in the record, which the court has discussed earlier in this opinion. Such "negative attitudes or biases, unfounded fears or speculation, prejudice, self-interest or ignorance" are categorically "arbitrary and irrational." *Congregation Kol Ami*, 309 F.3d at 143 (internal quotation marks omitted). The defendants, on the other hand, provide no rational explanation why Ordinance 966 must singularly preclude outpatient methadone treatment, why each resident at the residential treatment center must personally pay $150, and why $150 is a sensible amount to charge residents and is not arbitrary.[15] Therefore, the court concludes that there is a triable issue of material fact as to whether Ordinance 966's requirements and their application to the plaintiff are rational.

As discussed in the portion of this opinion addressing the as-applied ADA and Rehabilitation Act claims, the defendants provide four primary justifications for why they enacted Ordinance 966 and why they denied the plaintiff's conditional use applications. For much of the same reasons as explained in analyzing the ADA and Rehabilitation Act claims, the court finds

---

[15] The defendants argue that the Borough Code endows them with the power to enact this fee. Defs.' Br. at 14. However, the Code empowers municipalities to assess an "impact fee" which is "a charge or fee imposed by a municipality against *new development* in order to generate revenue for funding the costs of transportation capital improvements." 53 P.S. § 10502-A (emphasis added). Thus, it does not appear that the Code empowers the Borough to seek these fees from the residents personally.

these justifications could be pretexual and finds that there are a triable issues of material fact as to whether Ordinance 966 and the manner in which the defendants applied it to the plaintiff are irrational. First, the argument that the plaintiff's representative helped draft Ordinance 966, while notable, does not render the reason behind the ordinance rational because "the [defendants] ultimately had to approve." *First Step, Inc.*, 247 F. Supp. 2d at 150–51. Second, at a minimum there is a triable issue of material fact in regard to whether the third conditional use application (which the defendants ultimately permitted to move forward by withdrawing their opposition to the plaintiff's appeal in state court) did not meet Ordinance 966's criteria. Third, the defendants wrote Ordinance 966 only to prevent the "bootstrapping" of a methadone clinic, but provide no explanation for why methadone is distinct from other forms of outpatient treatment, such that the ordinance must specifically ban this form of medication. Finally, the defendants' concerns surrounding the residential treatment center and its relationship with the DUI Center are arguably irrational because they are based on "bare animus towards a group or 'fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding'" in that the defendants and members of the community feared those individuals housed at the DUI Center and worried that individuals at the residential treatment center might pose similar dangers.[16] *Congregation Kol Ami*, 309 F.3d at 135 (quoting *City of Cleburne*, 473 U.S. at 448); *see* Feb. 12, 2018 Hr'g at ECF pp. 134–35 (indicating that "inmate" from adjacent DUI center broke into home, so she had "concern that [the residential treatment center clients] could walk out of this facility" and "right into [her] house"); *id.* at ECF pp. 121–22 (fearing that "[i]f [the new facility] is run anything like the D.U.I.

---

[16] The Council's concerns about the DUI Center seem to stem from some concerns or distaste for the way in which the plaintiff's principal, Mr. Atiyeh, conducts business. *See* Pl.'s Ex. 7 at 1 ("I am no fan of Mr. Atiyeh" and "have no belief that he desires the facility simply because of his concern about the drug epidemic"). However, "the politics and animosities that often animate local decision-making are not matters of constitutional concern." *Maple Props., Inc. v. Twp. of Upper Providence*, 151 F. App'x 174, 180 (3d Cir. 2005).

center . . . I should probably put a pistol under the pillow because if I wake up in the middle of the night, I might have a guy just sitting there that's going to stab me."); Pl.'s Ex. 7 at 1 (expressing concern that there was "too much comparison and reference by residents[] to the Work Release Facility now in operation" and acknowledging that "Council cannot be influenced in their decision[] by problems with the operation of a different facility").

The court focuses on the defendants' fourth justification, *i.e.* their concerns about the way in which the plaintiff would operate a new facility, given the way in which Mr. Atiyeh operates the DUI Center. *See* Defs.' Br. at 10. Couched within this fourth justification is the defendants' concern about the residential treatment center's impact on property values, parking, and safety concerns. The court addresses each in turn.

During the first of the conditional use application hearings, a Council member worried about building "this thing in our town" because he wondered "[h]ow much is the property value going to hurt our taxpayers?" Feb. 12, 2018 Hr'g at ECF p. 98. The defendants have not shown that the concern about property values is a legitimate interest because they do not provide any evidence that the residential treatment center could impact property values. *See Horizon House Dev. Servs., Inc.*, 804 F. Supp. at 696–97 ("These views are unfounded and are not based on any credible opinion or evidence concerning group homes and people with mental retardation. The evidence in this case shows that group homes have no adverse impact on the property values of a neighborhood[.]").

It is also unclear that the defendants' concerns about parking at the residential treatment center constitute a rational interest. In *New Directions*, "the City claim[ed] that it met its burdens of showing legitimate purposes motivating its decision" and the district court agreed, "observ[ing] that the City Council expressed concerns about heavy traffic, loitering, noise pollution, littering,

double parking, and jaywalking." 490 F.3d at 306. The Third Circuit, however, "consider[ed] it inexplicable that the City failed to offer any evidence to support these concerns." *Id.* at 312. The Third Circuit found the district court's reasoning flawed because "the District Court appear[ed] to have relied on depositions of the council members which are not supported by the records of the three city council meetings. Records of these meetings contain[ed] no reference by the Council members to jaywalking, loitering, littering, double parking, or increased traffic" and "contain[ed] no evidence of complaints from nearby residents." *Id.* Any statements council members made concerning the parking issue "d[id] not account for [the plaintiff's] statement that the new facility would have 20 off-street parking spaces." *Id.*

Similarly, in this case, the defendants presented no evidence at the hearings that the residential treatment center would exacerbate parking issues. The statements of community members and Council members at the conditional use hearings did not account for the fact that the conditional use applications ensured the "[m]inimum parking standards will be met and no on-street parking will be permitted" and "no residents will be able to maintain a car on the premises[.]" Nov. 2017 Appl. at ECF p. 2; May 2019 Appl. at 4.

Finally, there is a question as to whether the defendants' safety concerns establish a rational basis. The defendants' security concerns derive from "a number of security lapses at the DUI Center just next door to the proposed Residential Treatment Center, where residents had absconded, and no one had notified the Borough." Defs.' Br. at 24 n.24. Thus, they note that "[s]ubsection 4.a(9) of Ordinance 966 is designed to address legitimate concerns about similar safety issues at the Residential Treatment Center, and Plaintiff's failure to comply therewith warranted denial of their conditional use application." *Id.* Subsection 4.a(9) is the subsection that mandates "[a]ny residents entering or leaving the Residential Treatment Center must be picked up

and dropped off by a third party though a secured process to prevent entry to and discharge into the public." Ordinance 966 at ECF p. 207. The defendants' concern does not account for the fact that the plaintiff's third conditional use application contained an explicit provision that "[a]s a policy of admission to the West Easton Residential Treatment Center, the resident shall sign a contract with the facility in which the resident agrees that they must be picked up by a third party upon discharge or if they chose the [sic] voluntarily leave the facility prior to discharge." May 2019 Appl. at 1. To further mitigate these security concerns, the third conditional use application also indicated that the facility would have "a perimeter fence" and the facility would "hire a third-party bonded security company as part of the operation of the facility." *Id.* at 1–2. Nonetheless, the defendants denied the third conditional use application.

Taking the "evidence of record in the light most favorable to the party opposing summary judgment, and resolving all reasonable inferences in that party's favor," the court concludes that there are triable issues of material fact concerning whether the defendants had a rational state interest in enacting Ordinance 966 and applying it to the plaintiff in the manner they did. *Wishkin*, 476 F.3d at 184.

### ii.    *Substantive Due Process*

The analysis of the substantive due process claim first provides an overview of the standard in a substantive due process challenge, and, second, applies this standard to this case. The court denies the defendants' motion for summary judgment on the plaintiff's facial and as-applied substantive due process claims.

### (a)    The Substantive Due Process Standard

For a plaintiff's "facial substantive due process challenge to the Ordinance to be successful, [it] must allege facts that would support a finding of arbitrary or irrational legislative action by

the" defendant. *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006)

(citation and internal quotation marks omitted). "In other words, the plaintiff" must show "that the

enactment of a zoning ordinance, in and of itself, violates the Due Process Clause." *Cornell Cos.,*

*Inc. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007) (citation and internal

quotation marks omitted). "Typically, a legislative act will withstand [a] substantive due process

challenge if the government identifies a legitimate state interest that the legislature could rationally

conclude was served by the statute[.]" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir.

2000) (citation and internal quotation marks omitted). A federal court can interfere with a

legislative act (like the promulgation of a zoning ordinance) "*if the governmental body could have*

*had no legitimate reason for its decision*." *Cnty. Concrete Corp.*, 442 F.3d at 169 (citation and

internal quotation marks omitted).

To mount an as-applied (or "course of conduct") claim, the plaintiff must meet an even

higher burden than it must meet to mount a facial substantive due process claim. *See Dotzel v.*

*Ashbridge*, 306 F. App'x 798, 800 (3d Cir. 2009) ("We utilize the 'shocks the conscience test' set

forth in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998),

to determine whether land-use decisions violate substantive due process."); *see also Cornell Cos.*,

512 F. Supp. 2d at 262 n.14 ("In order to succeed on the claim the defendants' course of conduct

may have to 'shock the conscience[.]'"). The shocks the conscience test "encompasses only the

most egregious official conduct." *Dotzel*, 306 F. App'x at 800 (quoting *United Artists Theatre*

*Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 401 (3d Cir. 2003)). "To shock the conscience,

the alleged misconduct must involve more than just disagreement about conventional zoning or

planning rules and rise to the level of self-dealing, an unconstitutional taking, or interference with

otherwise constitutionally protected activity on the property." *Id.* at 801 (citation and internal quotation marks omitted).

(b)    Application

The court denies the request for summary judgment on the plaintiff's facial substantive due process claim and the as-applied substantive due process claim.

(1)    The Facial Substantive Due Process Claim

The court denies the defendants' motion for summary judgment on the plaintiff's facial substantive due process claim because the plaintiff has "alleged" and produced evidence of "irrationality and arbitrariness." *Cnty Concrete Corp.*, 442 F.3d at 170. These allegations and portions of the record "present a case involving actions aimed at [the plaintiff] for reasons unrelated to land use planning." *Id.* (internal quotation marks omitted).

This case is distinct from *Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1034 (3d Cir. 1987), a case in which the Third Circuit "affirmed dismissal of a landowner's [substantive due process] challenge to the facial validity of a zoning ordinance." *Cnty. Concrete Corp.*, 442 F.3d at 170. The Third Circuit affirmed the dismissal because of "mere[] alleg[ations] that the zoning change in question 'did not conform to the spirit and general guidelines of the comprehensive plan which encouraged industrial development[,]'" rather than "allegations that indicate[d] irrationality." *Id.* (alteration in original) (quoting *Pace Resources*, 808 F.2d at 1035). In this case, however, as discussed in detail in the preceding sections, the plaintiff provides evidence of irrationality. Therefore, taking the "evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor,"

the court concludes that there are triable issues of material fact as to the plaintiff's facial substantive due process claim. *Wishkin*, 476 F.3d at 184.

(2)   The As-Applied Substantive Due Process Claim

While the court "offers no opinion as to whether the plaintiff['s] allegations against the [defendants]" on the as-applied substantive due process claim "could be proven at trial, for the purposes of summary judgment, plaintiff['s] presentation of evidence that" the defendants' denial of the plaintiff's conditional use applications "was motivated by antipathy toward" people suffering from addiction—"conduct which may shock the conscience—creates a genuine issue of material fact sufficient to survive summary judgment." *MARJAC, LLC, v. Trenk*, 380 F. App'x 142, 147–48 (3d Cir. 2010) (per curiam). If a jury finds that the defendants' decision to deny the conditional use applications came from the defendants' bias against those suffering from addiction, such conduct could shock the conscience as "conduct intended to injure in some way unjustifiable by any government interest[.]" *Id.* at 147.

## IV.   CONCLUSION

Because there are issues of material fact underlying each of the plaintiff's claims, the court denies the defendants' motion for summary judgment on the facial and as-applied challenges brought under the ADA, the Rehabilitation Act, and the Fourteenth Amendment's Equal Protection and Due Process Clauses.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.